**NATIONAL BANK OF COMMERCE OF PORTLAND, Executor, Plaintiff, Appellant,**

v.

**Clinton A. CLAUSON, Collector, Defendant, Appellee.**

**No. 4971.**

United States Court of Appeals First Circuit.

Nov. 2, 1955.

Jotham D. Pierce, Portland, Me., Leonard A. Pierce, Portland, Me., on the brief; Hutchinson, Pierce, Atwood & Scribner, Portland, Me., of counsel, for appellants.

Frank E. A. Sander, Sp. Asst. to Atty. Gen., H. Brian Holland, Asst. Atty. Gen.,

Ellis N. Slack, Washington, D. C., and Peter Mills, U. S. Atty., Portland, Me., on the brief for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal by a bank acting in the capacity of an executor from a judgment in a suit brought by it against a Collector of Internal Revenue to recover estate taxes. The only question presented is whether the plaintiff-executor's decedent, Isabelle C. Harmon, was a transferor within the meaning of § 811 (d) of the Internal Revenue Code of 1939 as to one-third of a certain *inter vivos* trust created in January 1926.

The facts were stated in full detail by the District Court. See 127 F.Supp. 386. It will suffice only to summarize them here.

Isabelle C. Harmon, the plaintiff's decedent, who will be referred to hereinafter simply as the decedent, was the second wife and the widow of one Charles C. Harmon who died testate, in Portland, Maine, on December 9, 1923. His survivors, in addition to his widow, were two daughters by his first marriage, one of whom was married and the mother of two children. Charles C. Harmon in his will left practically his entire estate, which consisted of the controlling stock interest in Loring, Short, and Harmon, the leading stationery, office supply, and book store in Portland, and about $82,000 in other assets, in trust. He named his widow, and two of his business associates, one of whom was his son-in-law and the father of his grandchildren, as trustees, and provided that in case of the death or resignation of a trustee his or her place was to be filled by the surviving trustees. The trust was to continue until twenty years after the widow's death, but could be sooner terminated by the unanimous consent of the trustees. One-third of the net income of this trust was to be paid to the widow for her life, "in lieu of any other interest whatsoever" in her husband's estate. Except for this life interest of the widow the trust income was to be paid to the two daughters, share and share alike, the issue of a deceased daughter to take by representation, and in the event a daughter died without issue the survivor to take all. No provision was made for the disposition of income in the event that both daughters died without issue before the trust terminated. Upon termination the corpus of the trust was "to be distributed in equal shares among my then surviving children, the child or children of any deceased child to take by right of representation," and in the event that at termination no child or issue of a child survived, the corpus was to be divided equally between two charities. Thus, in no event, could the decedent enjoy more under her husband's will than a life interest in the income of approximately one third of his estate.

But her property rights were not necessarily limited by her husband's will, for under the law of Maine as it stood at the time of Mr. Harmon's death, the decedent as his widow had the right within six months after the probate of his will to waive the provisions therein contained for her benefit and take one-third of her husband's net estate outright. And apparently the testatrix seriously considered claiming her statutory right for it is agreed that she was not always on friendly terms with her stepdaughters. She was, however, deterred from taking this step by the realization that if she should do so she would defeat her late husband's principal aim in setting up the trust which was to continue unitary ownership of his controlling interest in the Loring, Short, and Harmon stock until the fruition of certain plans, known to his trustees, which he had formulated with respect to that stock.

Faced with this situation it was decided by the parties concerned, all being competent adults, that since the trust could not be revoked in part, they would provide for its revocation *in toto* and then its re-establishment as to the Lor-

ing, Short, and Harmon stock. To this end on June 9, 1924 (during the period within which the decedent could have waived the provisions of her husband's will in her favor and taken one-third of his estate outright), all interested parties entered into an agreement to terminate the testamentary trust promptly upon the decedent's request, and thereupon to distribute its assets to the beneficiaries in the proportions to which they were entitled under the will, provided the beneficiaries coincidentally with the distribution created a new trust and immediately transferred and delivered their Loring, Short, and Harmon stock to the trustees named therein. The agreement set out the terms of the *inter vivos* trust to be created under the above circumstances and while it provided for the same board of trustees some of its other provisions differed from those of the husband's testamentary trust. Among these were the following:

Whereas in the testamentary trust the daughters' two-thirds of the income was not disposed of in the event they both died without issue before the trust terminated, the *inter vivos* trust provided that in that event the entire income of the trust was to be paid to the decedent during her lifetime. And another variance, also in the decedent's favor, was with respect to the distribution of the corpus of the trust upon its termination. Both trusts had like provisions with respect to termination by unanimous agreement. But upon termination by agreement of the testamentary trust no part of its assets were distributable to the decedent, whereas upon such termination of the *inter vivos* trust its assets were distributable to the "then ben-

eficiaries in the same proportions as their then interest in the income."

On January 14, 1926, the decedent requested the trustees to terminate the testamentary trust, they did so, and a new *inter vivos* trust was coincidentally established in accordance with the agreement of June 9, 1924.

Isabelle C. Harmon died in February 1944 while this *inter vivos* trust was still extant, and there being no doubt whatever that she had at that time the power in conjunction with other persons to change the beneficial enjoyment of the property in the trust, the sole question is whether the decedent had "at any time made a transfer" of one-third of the property constituting the trust *res* so as to make that third subject to estate tax under § 811(d) (2) of the Internal Revenue Code of 1939 quoted so far as material in the margin.[1]

The plaintiff-appellant, proceeding on the basic assumption that if the testamentary trust and the *inter vivos* trust had been identical in their provisions there would be no question of any tax liability, contends that the differences between the two trusts were theoretical rather than practical, and in any event were not of sufficient importance to transform the decedent from a "mere conduit of title" to an actual transferor within the meaning of § 811(d) (2), supra. We do not agree.

It may be that the difference between the trusts with respect to the devolution of income in the event both daughters died without issue is more theoretical than actual for the provision of the *inter vivos* trust giving all income to the decedent in that event instead of leaving it undisposed of as in the testamentary

---

1. "§ 811. Gross estate
   "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—
   *   *   *   *   *   *   *   *
   "(d) Revocable transfers
   *   *   *   *   *   *   *   *

"(2) Transfers on or prior to June 22, 1936. To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, *   *   *." 26 U.S.C.A. § 811.

trust, could only come into effect on the remote chance that four substantially younger persons should predecease the decedent. But however that may be, the difference noted earlier in this opinion between the two trusts with respect to the decedent's right to take corpus in the event of termination by agreement is far from theoretical. The plaintiff-appellant, arguing to the contrary, says that there was no practical chance of terminating the *inter vivos* trust by agreement for to do so required unanimous consent of the trustees and one of them, as the husband of a daughter beneficiary, could naturally and safely be counted upon to hold out against termination since should he consent one-third of the trust *res* would be irrevocably diverted from his wife and children and his sister-in-law to his sometimes unfriendly step-mother-in-law.

This may all be so, but should the son-in-law trustee die, which is not a possibility so remote as to be theoretical, his place as a trustee would be filled by the joint action of the decedent and the other trustee, who presumably would have no interest for or against termination,[2] and in this situation the place might well be filled by a person amenable to the decedent's wishes.

It seems to us that counsel for the collector are correct when they say in their brief:

"The essential point is that under Maine law the decedent had the right not only to get one-third of the 'free assets' [the assets other than Loring, Short, and Harmon stock worth approximately $82,000] but also to get one-third of the stock. And, contrary to the taxpayer's contention, she did not completely surrender this latter right, but retained the power, along with other persons, to vest one-third of the stock in herself upon the termination of the trust. And it is pre-cisely because of this retained power that one-third of the trust must be included in her gross estate. The mere fact that she did not exercise the power does not, of course, have any bearing on the taxability; for it is the existence of the power, not its exercise, which results in the inclusion of the trust in her estate."

The judgment of the District Court is affirmed.

---

**2.** The motive for the creation of the *inter vivos* trust was inoperative after 1931 for in that year the trust sold its entire block of Loring, Short, and Harmon stock.