**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**ESTATE of Elizabeth W. VEASE, Deceased, James L. Vease, Executor, Respondents.**

No. 17656.

United States Court of Appeals
Ninth Circuit.

Jan. 28, 1963.

Rehearing Denied Feb. 26, 1963.

Crocker, District Judge, dissented.

Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, I. Henry Kutz, Michael I. Smith and Richard Roberts, Attorneys, Department of Justice, Washington, D. C., for petitioner.

Alfred E. Lindbloom and Laurence A. Masselink, Detroit, Mich., for respondent.

Before HAMLEY and DUNIWAY, Circuit Judges, and CROCKER, District Judge.

HAMLEY, Circuit Judge.

The Commissioner of Internal Revenue asserted an estate tax deficiency of $374,243.55 against the estate of Elizabeth W. Vease. The Tax Court redetermined the deficiency to be $539.83. The Commissioner has petitioned this court to review the Tax Court's decision. The findings of fact and opinion of the Tax Court are reported in 35 T.C. 1184. We have jurisdiction under section 7482 of the Internal Revenue Code of 1954.

During her life the decedent, hereinafter referred to as Elizabeth, had the right to net income from two trusts. She also had a testamentary power to provide her surviving husband with an annuity from these trusts, such annuity not to exceed one-half their net income in any given year. In addition she had

a testamentary power to appoint which of her children should receive the remainder, and in what proportions and upon what terms, trusts and conditions.

In assessing a deficiency against the estate, the Commissioner determined that these trusts had resulted from a transfer of property made by Elizabeth during her lifetime. He further determined that since Elizabeth had retained a life interest in the property, or had retained a reversionary interest in it, or both, its value is includible in her gross estate by virtue of section 811(c) (1), (B), or (C) or both and (2), Internal Revenue Code of 1939.[1]

The taxpayer's position, which the Tax Court adopted, is that Elizabeth did not transfer the property in question. Rather, the Tax Court concluded and respondent urges here, the trusts are a result of transfers made from the estate of her father, hereinafter called Walker, by reason of Elizabeth's status as Walker's heir.

The general question to be decided on this review, therefore, is whether the trusts in question resulted from transfers to the trustees, by Elizabeth, of her property, or from transfers to the trustees from the estate of Walker, made by reason of her standing as his heir.

The essential facts are not in dispute. Elizabeth died testate on September 10, 1952, a resident of Arizona, at the age of 49. James L. Vease, her surviving husband, is the executor of her estate. She did not exercise any powers of appointment by means of her will and no provision of her will relates to any trusts involved in this case.

Walker died testate on December 16, 1919, a resident of Detroit, Michigan. His survivors were his wife, Margaret T. Walker, who was then 57 years old, and five children, as follows: Elizabeth, who was then 16 years old; Mary Margaret W. Small, 25, herein called Mary; Harrington E. Walker, 35; Hiram H. Walker, 33; and F. Caldwell Walker, 29.

Walker executed his last will on June 24, 1918. It was prepared by his attorney, Z. A. Lash. Walker died suddenly in New York City on December 16, 1919. His estate, located in the United States and Canada, had a value before taxes of $4,881,471.31, and a net value after taxes of $4,071,727.58. A few days before his death, Walker had worked out with Lash some modifications which he wished to make in his will. Lash prepared a new will incorporating these modifications but Walker died before it could be executed.

On December 28, 1919, twelve days after Walker's death, Lash went to Detroit to meet with Walker's widow and five children. The widow and children had not seen Walker's will and did not know anything about its contents. Neither the executed will nor the unexecuted will was presented to the family at this meeting. Lash told them that there was both an executed will and a later unexecuted will and, without disclosing the contents of either document, asked them what they wanted to do under the circumstances.

The members of the family privately considered the problem while Lash waited for their reply. Their unanimous decision, conveyed to Lash when the meeting with him resumed, was that they wanted to do everything possible to carry out and comply with Walker's last wishes as evidenced by the unexecuted will. They decided upon this course even though they did not then know whether the provisions of the unexecuted will were more or less favorable to them individually or collectively, as compared with the provisions of the executed will.

Lash immediately wrote in longhand an agreement which the members of the family then signed. In it the widow and

---

1. In the earlier stages of this case the Commissioner also took the position that Elizabeth had retained a power to alter, amend, revoke or terminate the transfers which she had made; and that accordingly the value of the property is includible in her gross estate under section 811(d), Internal Revenue Code of 1939. Since this position was abandoned during oral argument we do not consider it here.

all of the children agreed, one with the others as follows:

"to do everything which may be necessary in order that the wishes of the said J. Harrington Walker as contained in the said [unexecuted] Will prepared by Mr. Lash may, so far as we are or any of us is concerned or affected, be carried out, and all consents and documents required for that purpose and all instructions to the executors and trustees of the existing executed Will which may be required will be signed and given by us, and we request Mr. Lash to see to the carrying out of this agreement. * * * Whatever application to any Court may be necessary on behalf of Elizabeth (who is a minor) to make this agreement and the carrying out thereof effective will be made. Probate of the existing Will shall be applied for in order that this agreement may be properly and effectively carried out."

On January 16, 1920, the Probate Court for Wayne County, Michigan, appointed G. G. Benfield, who had been Walker's secretary for many years, as the legal guardian of Elizabeth. On February 25, 1920, the Probate Court admitted and allowed Walker's will to probate. Letters testamentary were issued by the court appointing Walker's three sons as executors.[2]

On March 18, 1920, Benfield filed in the Probate Court a petition for authorization to execute on behalf of Elizabeth the family agreement of December 28, 1919, another draft of which, dated February 19, 1920, had been prepared by Lash for this purpose. Attached to the petition was a copy of the family agreement together with a copy of the unexecuted will.[3] The Probate Court immediately signed an order of authorization and on the same day, March 18, 1920, the widow and all children, and Benfield as guardian for Elizabeth, signed the family agreement dated February 19, 1920.[4]

On June 17, 1921, Walker's will was duly proved and registered for ancillary administration of the estate in Canada, in the Surrogate Court of York County,

2. They were also named executors and trustees in Walker's unexecuted will. The National Trust Company, Ltd., of Toronto, Ontario, was also named as an executor and trustee in both wills but did not take probate of the will in the United States.

3. In paragraph 6 of the petition the following was stated:
"(6) That it is for the best interests of said minor child that the terms of said agreement be fulfilled as said minor child will, in such event receive a greater share of the estate of said deceased than under the terms of the Will which has heretofore been filed for probate."

4. In material part the agreement dated February 19, 1920, reads as follows:
"Whereas, the above named parties on December 28, A.D. 1919, executed an agreement relating to a new will which Mr. Z. A. Lash of Toronto, Ontario, had prepared for Mr. J. Harrington Walker's signature, but which was not signed on account of the sudden and unfortunate death of Mr. J. Harrington Walker, and
"Whereas, in order to secure authority from the Probate Court of Wayne County, Michigan, to the above named Guardian to sign a similar agreement on behalf of said Elizabeth T. Walker, a minor, it has become necessary to set forth specifically the terms and conditions of said unexecuted new will and to identify particularly the documents which constitutes [sic] said new will, Now Therefore, the parties hereto do hereby mutually agree that the papers hereto attached marked Exhibit 'A' constitute a true and complete copy of said new will of J. Harrington Walker heretofore referred to and said papers marked Exhibit 'A' are hereby made a part hereof; and the parties hereto do further mutually agree to do everything which may be necessary in order that the wishes of the said J. Harrington Walker, as contained in the said Exhibit 'A' may so far as any of the parties hereto is concerned or affected, be carried out, and do further agree to execute and deliver all consents and documents required for that purpose and also to execute and deliver all necessary and proper instructions to the executors and trustees of the existing executed will of Mr. J. Harrington Walker dated June 24, 1918 and heretofore filed for probate in the Probate Court for Wayne County, Michigan."

Ontario. Letters of ancillary administration were issued to the National Trust Company and Walker's three sons as executors and trustees under the will. The major part of the estate was located in Canada.

The executed will directed the testamentary trustees to set apart and hold separately an unspecified amount of assets sufficient to pay the widow, Margaret Walker, out of income, the sum of $50,000 per year; the cost of renting accommodations in the Garden Court Apartments in Detroit, Michigan for her life ($712.50 per month); the taxes and repairs on certain garage property in Detroit, and the summer home at Magnolia, Massachusetts; and to purchase a $50,000 private dwelling house if the widow preferred to reside in a house instead of the apartment.

It also provided for the payment of fifty-two bequests including bequests of Pere Marquette bonds of the par value of $150,000 to the widow and to each of the two daughters. All of the bequests were to be paid or delivered at such times and in such amounts as the trustees might deem expedient, and no legatee had a right to call for payment or delivery until the trustees deemed it expedient.

Under the provisions of the executed will the residue of the estate was left in trust to be divided into five equal parts, one part for the benefit of each of Walker's five children, who were to receive the income. The principal of their respective shares was payable to them on attaining thirty years of age. Discretionary right was given to the trustees to pay the beneficiaries sums not exceeding $5,000 per annum out of principal. The will further provided that upon the death of a beneficiary before attaining age thirty, leaving lawful issue, the share of such beneficiary should be held by the trustees of Walker's will for such issue according to the terms, limitations and provisions, shares and appointments as the beneficiary might by last will provide and appoint, and failing such provision and appoint-ment, then the share was to be held by Walker's trustees for and divided among such issue, share and share alike.

Each beneficiary could also make provision for a spouse and if no provision was made, Walker's trustees could in their discretion pay over income to the surviving spouse not in excess of fifty percent of the net income for any year. In the event a beneficiary died before attaining age thirty without lawful issue surviving, the trustees were to hold such beneficiary's share for the persons and purposes such beneficiary might by last will appoint and failing such appointment, the share was to be added in equal parts to the other shares.

Under the terms of the unexecuted will, the trustees were directed to set apart and hold separately such assets of the estate as would amply provide for the payment of an annuity of $75,000 to the widow. The increased amount of the annuity was in lieu of provisions for the payment by the estate of rent, taxes and other outgoings in connection with the Garden Court apartments, or with any residence chosen by the widow, or in connection with her residence in the summer home at Magnolia.

The widow was also given a bequest of $200,000 payable in bonds, mortgages, or high-class interest-bearing securities in such amounts and at such times as the trustees deemed expedient.

The unexecuted will also provided for forty-five specific bequests of cash and securities (as compared with fifty-two in the executed will) payable from time to time as the trustees deemed expedient, but no specific bequests were made to Walker's daughters.

Under the terms of the unexecuted will, the residue of the estate was left in trust for the three sons and two daughters. The residue was to be deemed divided into twelve equal parts, three parts for the benefit of each of the daughters (six parts, or fifty percent) and two parts for the benefit of each of the three sons (six parts, or fifty percent).

Assets were to be allocated from time to time as the trustees under the 1919 document deemed prudent and practicable. As each son attained the age of forty years, the trustees under the 1919 document could deliver securities and assets to him on account of his two parts, in such amounts and at such times as the trustees might deem best. Pending payment and delivery, the net interest or income from a son's part was to be paid to him.

The three parts of the residue held for Mary Walker Small and the three parts held for Elizabeth, the decedent herein, when she attained the age of 21 years, were to be transferred to new trustees. These trustees were to be named or appointed by the testamentary trustees under the unexecuted will (the 1919 document). One incorporated trust company could act alone but if individuals without a trust company were named or appointed, there had to be not less than two. One or more of the testamentary trustees named in the 1919 document were to be eligible.

The terms, conditions, and trusts upon which the part of the residue allocated to the daughters was to be held were to be settled and determined upon by the named trustees in the unexecuted will but the following provisions were required to be included:

(a) The net income of the trust estate was to be paid to or applied for the benefit of the daughter during her life without power of alienation or anticipation and free from the control of any husband.

(b) Advances out of the corpus of the trust estate could be made to the daughter not in excess of $5,000 in any one calendar year.

(c) Upon the daughter's death the trust estate was to be held for the benefit of the lawful child or children of the daughter in such proportions and upon such terms, trusts, and conditions as the daughter might by her last will direct or appoint (with power to exclude one or more from such division or proportions) and failing such direction or appointment then the trust estate should be held for the child or children, share and share alike. The daughter was to be given power to provide by her will for payment to her husband of an annuity not exceeding in any year fifty percent of the net income for such year.

In the event either daughter died without leaving lawful issue, the trust estate held by the trustees of her parts of the estate was to be divided into five parts, two of which were to belong to the surviving sister and the remaining three parts to the surviving brothers, share and share alike. Provisions were made for the payment of an annuity to a surviving husband and for distribution to the surviving brothers in the event there should be no sister surviving.

The unexecuted will further provided that should Elizabeth, the decedent herein, die before reaching 21 years of age, leaving no lawful issue, the three parts of the residue intended for her should be divided into five equal parts, two of which should belong to Mary Walker Small and one of which should belong to each of the three sons.[5]

As of June 30, 1928, the capital account of the portion of the Walker estate being probated in Canada had increased to over $5,500,000. On that date, $800,000 of the assets were set aside to provide for the widow's annuity. On the same day distribution was made of $3,170,430.42, of which $1,585,215.21 was distributed to the three sons, and an equal amount was set aside to be distributed to the daughters' trusts. As of June 30, 1928, Mary was 33 years of age, and Elizabeth was 25.

The daughters thereafter filed objections to the accounts filed by the executors and trustees in Canada, covering the period June 30, 1928 to September 30,

---

5. The above résumé of the terms of the executed and unexecuted wills is taken almost verbatim from the findings of fact of the Tax Court. See 35 T.C. 1184, at 1189–1191.

1933. This resulted in litigation in the Supreme Court of Ontario.[6] The action was settled on November 3, 1934, under "Minutes of Settlement," which were approved by an order of the Supreme Court of Ontario entered on the same day.[7] Pursuant to this settlement agreement an instrument was executed on December 13, 1934, by and between National Trust Company, Ltd., and the three Walker sons, as executors and trustees of the Walker estate, parties of the first part, and the new trustees referred to in the settlement agreement.

The December 13, 1934 instrument is entitled "Indenture, Deed, and Declaration of Trust." By this instrument the parties of the first part appointed the parties of the second part the trustees of the shares of Mary and Elizabeth. An enforcible trust was thereby established, herein called the Canadian Trust, having trustees, corpus and beneficiaries. Provision was made for determining the rights and duties of the trustees and the rights of the beneficiaries. Under the terms of this 1934 instrument, the named trustees were invested with title to all assets comprising the shares of Mary and Elizabeth in the Canadian part of the Walker estate:

"* * * to which they became entitled by virtue of the said probated will [1918 will] as altered and affected by the said agreements [dated December 28, 1919, and February 19, 1920] to abide by the said unsigned Will, now, or hereafter to be allocated or distributed by the Parties of the First Part as Executors and Trustees of the estate of the said J. Harrington Walker as part of the shares of the said daughters, and hold the same, in Ontario, * * *."

upon stated trusts.

The trusts therein stated constitute spendthrift trusts, the trustees having the ordinary fiduciary powers. Under this trust, Mary and Elizabeth were given life estates in the trust consisting of the right to receive, in equal shares, the income for life, and payments out of the corpus not to exceed $5,000 a year to either one. Upon the death of either life beneficiary her share of the trust estate was to be held for the benefit of her lawful child or children.[8]

It was recited in the preamble of this agreement that under the last will of Walker, each of his daughters was to receive a one-fifth share of the residue of the estate; and that on December 28, 1919, and February 19, 1920, prior to the probating of Walker's will, the daughters, their mother, and brothers had en-

6. The parties and issues involved in this litigation, and the relief sought, are described in the findings of fact of the Tax Court. See 35 T.C. 1184, 1191–1192.

7. It was provided in this settlement agreement as follows:

"Subject to the approval of the Court, the Trustees of the estate of J. Harrington Walker deceased shall, pursuant to the trusts created by agreements bearing date the 28th day of December, 1919 and the 19th day of February, 1920, for the purpose of giving effect to the trusts created by the unsigned Will of J. Harrington Walker deceased, nominate, constitute and appoint Guaranty Trust Company of Canada, Gustavus G. Benfield, Sidney Ruggles Small and Hamilton Hector Paterson (hereinafter referred to as the New Trustees) who are nominated by the plaintiffs, to be trustees of the trusts referred to in paragraph 10 of the said unsigned Will for the benefit of the plaintiffs and others and shall concur in the settlement of the deed necessary to create the said trusts which deed shall be approved by the Court."

8. With regard to the rights of beneficiaries this indenture also provided in part as follows:

"6. That upon the death of a daughter her share of the said trust estate shall be held for the benefit of her lawful child or children, including any legally adopted child, and for the lawful issue of any deceased child, in such proportions, and upon such terms, trusts and conditions as the daughter so dying may by her last Will direct or appoint (with power to exclude one or more from such division or proportions), and failing such direction or appointment, or in so far as no such direction or appointment shall extend, then for the said child, or if more than one then for the children share and share alike, and the lawful issue of any deceased child, such issue to take the deceased parent's share, * * *."

tered into agreements providing that "a certain instrument" prepared as a last will of Walker, although not signed by him, "should be followed and observed as though duly executed and in fact his last will."

Aside from the power of appointment provided for in paragraph 6, quoted in note 8 herein, this Canadian trust instrument contained no provisions allowing the beneficiaries to alter, amend, revoke, or terminate the trust. Considered as a whole, the trust indenture complied with the provisions of paragraphs 11 and 12 of the unexecuted Walker will.

The Canadian trust agreement was not intended to be executed by either Mary or Elizabeth and they did not participate in its execution as signatories. It was approved by the Supreme Court of Ontario, as were also the appointment of the trustees thereunder, and the deed transferring assets from the Canadian part of the Walker estate to the trustees named in the instrument. The balance in the capital account of the Canadian trust on September 10, 1952, the date of Elizabeth's death, was $2,188,572.88.[9]

The three Walker sons acted as executors of the American portion of the Walker estate until March 25, 1930. On June 2, 1922, they were appointed testamentary trustees under the will, and were discharged on April 24, 1940, upon the closing of the estate. Numerous complicated problems arose in connection with the administration of this part of the estate, as described in detail in the findings of the Tax Court. See 35 T.C. 1184, 1196–1198. Under a settlement agreement reached by interested parties on January 31, 1936, it was provided, among other things, that a partial distribution should be made to Mary and Elizabeth consisting solely of shares of stocks, bonds, and accounts receivable of Garden Court Realty Company.

In the petition seeking authority to make this partial distribution reference was made to the 1918 will. An order authorizing such partial distribution was entered by the Wayne County Probate Court on April 8, 1936. The value of this partial distribution was $24,733.

On April 14, 1939, the three sons assigned all their right, title, and interest in the trust estate to Mary and Elizabeth in equal shares. The book value of these assets was $386,034.65. On March 4, 1940, Elizabeth, who then had exclusive title to all of her share of the American portion of the Walker estate, entered into a deed of trust with Harrington and Hiram H. Walker as trustees under the Walker will, F. Caldwell Walker, who was no longer a trustee under that will, Benfield, Sidney Ruggles Small, and Hamilton Hector Paterson as trustees.

This indenture was designed to fulfill the objectives of the unexecuted will and the family agreements of December 28, 1919, and February 19, 1920, insofar as the American portion of the Walker estate was concerned. Under the terms of the instrument Elizabeth conveyed to the trustees therein named, her share of the assets which had been distributed to her by the trustees of the American portion of the Walker estate.

By this indenture, the three sons nominated Benfield, Small and Paterson to act as trustees thereunder. The net income was payable to Elizabeth for life and the trust was to terminate upon her death unless any part of the income was

---

9. Beginning in 1936 there was other litigation involving the Canadian part of the Walker estate and hence the assets of the Canadian trust, as described in the findings of fact of the Tax Court. See 35 T.C. 1184, 1194–1195. This litigation was terminated pursuant to a settlement agreement the preamble of which recited the following:

"Administration of the said estate [the Walker estate] is governed by two agree-ments in writing entered into by the widow and children of the late James Harrington Walker, dated respectively the 28th of December, 1919, and the 19th day of February, 1920 relating to a draft Will prepared by Mr. Z. A. Lash, Q.C., for the said James Harrington Walker shortly before the latter's death."

payable to a surviving husband. Upon termination, the trustees were to pay over the trust estate to Elizabeth's children and the issue of any deceased child in such proportions as she might by her last will direct or appoint, with power to exclude one or more from such division, and failing such direction or appointment then to the children, share and share alike.

After the execution of the trust indenture on March 4, 1940, both the Canadian and the American trusts were administered according to the terms of the respective trust agreements. Nothing of moment here occurred until Elizabeth's death in 1952.

At the time of her death, the fair market value of Elizabeth's share of the Canadian trust was $976,885.60. The property in her American trust was valued at $96,729.21. In the estate tax return filed by her estate neither the Canadian nor the American trust was included as a part of the decedent's gross estate.

In concluding that Elizabeth had received her life estate by inheritance the Tax Court relied primarily upon the principle announced in Lyeth v. Hoey, 305 U. S. 188, 59 S.Ct. 155, 83 L.Ed. 119, and developed more fully in subsequent cases. That principle, that a receipt of property assumes the nature of the underlying claim upon which it is based, was formulated in an income tax setting. Property received by a disinherited heir in settlement of a will contest, the Court held in Lyeth v. Hoey, is property received by inheritance. And so, it is not taxable to the recipient as income.

From its origin in this limited context, the principle has been expanded into one of considerable significance in the fields of federal estate and gift taxation as well. Its converse implications were dealt with in estate tax litigation in Estate of Du-

mont v. Commissioner, 3 Cir., 150 F.2d 691, in which it was held that the deductibility of estate outlays depends upon the nature of the claims pursuant to which they are made.[10] Obversely, for estate tax purposes the property received in settlement of a will contest is received from the decedent's estate; it is not transferred by the other parties to the settlement. Estate of Reed v. Commissioner, 8 Cir., 171 F.2d 685.

In deciding the case before us, the Tax Court concluded:

"It does not seem possible to distinguish the Lyeth case from the present one in principle. The important point is that what Elizabeth received as a result of the family agreement she took because of her standing as an heir. It was that status which commanded the family agreement and was recognized by it."[11]

In our view the Tax Court erred in holding that the principle of Lyeth v. Hoey is controlling here. One who has standing as an heir by intestacy, or as a beneficiary under a previous will, may make such standing the basis for a challenge of the will as a whole, or a claim with regard to some provision thereof. Property received from the estate in settlement of a bona fide challenge or claim of this kind, in whatever amount and however conditioned as to disbursement or otherwise, may properly be said to be received by reason of such standing. Lyeth v. Hoey and the cases decided in accord with it are all instances of this kind. In each, the property ultimately received was in settlement of some theretofore unsatisfied challenge or claim, asserted either by an heir or a beneficiary under a previous will.

But Elizabeth, her sister, brothers and mother were all named in the executed will, which was the only will ever exe-

10. Property received by a charity named in a prior will in settlement of a contest of a subsequent will was held to be deductible by the estate as a gift made to charity.

11. Estate of Elizabeth W. Vease, 35 T.C. 1184, 1207.

cuted by Walker, and none of them challenged that will or any provision thereof. The basis of the family agreement was therefore not the standing of an heir or heirs to contest the will as a whole, or of a beneficiary under a previous will to question a provision of a later will. Rather, it was the standing of each, as a beneficiary under the executed will, to agree upon a disposition of the property bequeathed and devised to all of them thereunder in a manner different from that provided in the will.

The resulting agreement was nothing more than a voluntary rearrangement of property interests acquired under an admittedly valid will, concluded without duress of unsatisfied claims.[12] Under these circumstances the transfer to the trusts must be deemed to have been made from property each had received from the estate.

If it be assumed that by reason of the mutual renouncement of rights under the executed will, accomplished by the family agreement, the members of the family reinstated their standing as heirs by intestacy, at least as to the residue under the executed will, the result would not be different. There being no indicated quarrel between them as to their respective rights by intestacy, the family agreement providing for the establishment of trusts, does not represent a settlement of claims asserted against the estate. Again, it is nothing more than an arrangement whereby each has contributed his prospective or received share of the estate to a common fund to be handled in the manner therein provided.[13] Under these circumstances the transfer to the trusts must be deemed to have been made by the individual heirs from property each had received from the estate.

Thus, whether the family agreement be regarded as between persons having standing as beneficiaries under the executed will, or as heirs by intestacy, the result is the same. In either event, the fact that the exact rights were not known when the original family agreement was entered into is immaterial. Each member of the family traded on the assumption that he and all other members had such rights under the executed will as to make the family contract an equitable arrangement. Moreover, before the agreement became a binding obligation by reason of court approval on behalf of Elizabeth, then a minor, all parties thereto knew exactly what their rights were under the executed will, and what they would have been had the second will been executed.[14]

---

12. For the significance of uninhibited volition in this type of arrangement, see National Bank of Commerce of Portland v. Clauson, 1 Cir., 226 F.2d 446. There, the decedent's husband had bequeathed her a life interest in one-third of his estate in trust. Under local law she had an undisputed right to one-third of his estate in fee. For reasons peculiar to the estate, a new trust was established by agreement between the original beneficiaries, in which the decedent retained a one-third life interest. In addition she retained a power to revoke the trust and take one-third of its corpus free of the trust. The decedent was deemed to have transferred the property into the trust because its creation was dictated by reasons other than a desire to "settle" her statutory widow's claim.

13. Another consideration which leads to the same conclusion is that, if the corpora of the trusts were considered to result from transfers from the estate by way of intestacy, only the then heirs of Walker could be beneficiaries thereof. But the trusts actually set up created at least contingent property rights in persons who could not have claimed a share of Walker's estate as heirs. At the time of her father's death Elizabeth was only sixteen years of age. She had no children to claim as heirs to his estate. Yet the family agreement provided for the creation of a contingent remainder interest in her issue, subject only to rearrangement by Elizabeth's appointment. In order to create such a property interest in others the transfer to the trusts must have come from Elizabeth and the other beneficiaries in Walker's will.

14. In other litigation concerning the family agreement now before us, the Court of Claims has suggested that the principle in Lyeth v. Hoey is applicable; but we do not find its reasoning persuasive.
  In Benfield v. United States, 27 F.Supp. 56, 88 Ct.Cl. 486, it was urged that the

In support of the Tax Court's decision, respondent urges that the case of Brown v. Routzahn, 6 Cir., 63 F.2d 914, is applicable. It was there laid down that the federal tax on transfers made in contemplation of death is levied on the transfer of property; not on the exercise of a right to renounce testamentary gifts. Accordingly, if under local law a legatee or devisee has the option of accepting or rejecting his testator's bounty, rejection of the gift does not result in a taxable transfer to its residuary recipient.[15]

Respondent cites Michigan case law to the effect that a will is ineffectual to pass either personal or real estate until it has passed "the ordeal of probate"; and further, that no one can be made the owner of an estate against his consent by devising it to him. For this reason it is contended that Brown v. Routzahn should be followed.

But the legal ability to renounce does not establish renunciation as a fait accompli. That determination can only be made on the basis of the record before us. Respondent urges that Elizabeth did not accept, and so could not have transferred, her share under Walker's will because the family entered into its agreement before the will was admitted to probate.

Two facts militate against our accepting that view. One is that the family agreement did not become binding on Elizabeth until it was executed by her guardian on March 18, 1920; Walker's will had been admitted to probate on February 25 of the same year. The other is that Elizabeth did not purport to renounce her share in favor of the other will beneficiaries. She bartered with them. Furthermore, she attempted to, and as the record demonstrates, was successful in creating interests in persons who were not parties to the agreement and who would not otherwise have shared in Walker's estate.

It is one thing to say that a testamentary beneficiary may reject a part of his gift, even to the point of picking and choosing, without making a transfer to the residuary beneficiary. Leaving a larger estate to be shared by others need not constitute a transfer in any sense of the word. But it is another thing to say that a will beneficiary may exchange his fee interest in a fifth of the estate for a life interest in a quarter, and at the same time create remainder interests in persons who would not otherwise have shared, without having accepted or transferred anything. We hold that during her lifetime the decedent, Elizabeth Vease, made transfers of the property which constitutes the corpora of the trusts under consideration.

Having concluded that Elizabeth did not transfer any of the property in question, the Tax Court did not reach the other questions there presented. Accordingly, we do not decide them here. The

difference between what Margaret T. Walker, Walker's widow, would have received as an annuity under Walker's will ($50,000) and what she did receive under the family agreement ($75,000) had been received contractually from the heirs and so was subject to taxation as income. The court replied at page 63 of 27 F.Supp.:

"In the instant case there was no legal conflict between the heirs. The settlement agreement was voluntary and amicable. Under these circumstances, we think that whatever additional amount she received under the agreement was merely a gift and consequently not taxable. In any event being an heir in fact, we think there is no substantial difference in the effect of the agreement in the instant case from

that made in Lyeth v. Hoey, supra, and that she was consequently entitled to hold all she received thereunder free from tax."

If the additional $25,000 was a gift from the other heirs she could not have received it, as an heir, from Walker's estate. The two sources are mutually exclusive.

15. That local law is important is illustrated by Hardenbergh v. Commissioner, 8 Cir., 198 F.2d 63, 66. The relinquishment of interests acquired by intestacy was held to be properly taxable as a gift because "* * * title to an interest in decedent's estate vested in the taxpayers by operation of law which neither had the power to prevent."

·case must be remanded for a determination of the extent to which the trusts are a result of transfers made by Elizabeth and the extent to which they are a result of transfers made by other parties to the agreement.

The judgment of the Tax Court is reversed and the case is remanded for disposition consistent with this opinion.

CROCKER, District Judge (dissenting).

I would affirm the Tax Court for the reasons set forth in its opinion.