JEAN RONALD GETTY AND KARIN GETTY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18726-85.       Filed July 27, 1988.

*Philip S. Magaram* and *Mark S. Levin,* for the petitioners.
*Charles W. Jeglikowski* and *John O. Kent,* for the respondent.

COHEN, *Judge:* Respondent determined a deficiency of $6,883,975 in petitioners' Federal income tax for 1980. After concessions, the issues for decision are (1) whether petitioner Jean Ronald Getty's receipt of $10 million in settlement of his claim against the residuary beneficiary of his father's estate was exempt from taxation as a gift,

bequest, devise, or inheritance, and, if not, (2) whether petitioner Jean Ronald Getty's receipt of the $10 million was attributable to the sale or exchange of a capital asset.

The family members discussed in this opinion are designated by their initials as follows:

*Petitioner's grandparents*

| | |
|---|---|
| GG, Sr. | George Franklin Getty |
| SCG | Sarah C. Getty |
| Helmle | Otto Helmle |

*Petitioner's parents*

| | |
|---|---|
| JPG | Jean Paul Getty |
| AHG | Adolfine (Fini) Getty |

*Petitioner's brothers*

| | |
|---|---|
| GFG | George Franklin Getty (born 1924, died 1973) |
| EPG | Eugene Paul (Paul, Jr.) Getty (born 1932) |
| GPG | Gordon Peter Getty (born 1933) |
| TWG | Timothy Ware Getty (died 1958) |

FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Jean Ronald Getty (petitioner) and Karin Getty resided in California when their petition was filed.

Petitioner is the son of J. Paul Getty (JPG) and Adolfine Getty (AHG). On December 31, 1928, JPG, then 36 years of age, married AHG, an 18-year-old German national whom he had met in Europe. AHG was JPG's third wife. He brought her to live in the United States, but she returned to Germany in 1929 as a result of her mother's death. She then decided to remain in Germany. Petitioner was born in Germany on December 19, 1929.

George Franklin Getty (GG, Sr.), JPG's father, died on May 31, 1930, leaving an estate valued at approximately $10.8 million. In his will, GG, Sr., left $500,000 outright to JPG, $300,000 in trust for George Franklin Getty (GFG) (then 5 years old), and the residue of his estate to his wife Sarah C. Getty (SCG), JPG's mother.

AHG's father, Otto Helmle (Helmle), had negotiated a prenuptial agreement for her in 1928. In December 1930, JPG and AHG began discussing divorce. AHG negotiated improvements to the prenuptial agreement in May 1931.

JPG obtained a Mexican divorce in 1932. In May 1933, the prenuptial agreement was amended again. In 1934, AHG sought a further improvement in the prenuptial agreement and attacked the validity of the Mexican divorce.

By 1934, JPG had remarried and had two sons by his fourth wife. In a letter to Helmle dated November 20, 1934, discussing AHG's request for an improvement in the agreement and her attack on the validity of the divorce, JPG threatened that if AHG brought him "worry, anxiety, and trouble," he would not be disposed to leave petitioner a large sum of money and it would be "most unfortunate" for petitioner's future. Less than 1 month prior to that letter, JPG had executed a codicil to his will, reducing petitioner's bequest to $5,000. Prior to the execution of that codicil, petitioner would have been treated equally with JPG's other children under the will and its codicils.

In 1934, JPG owned all the capital stock of a corporation then named George F. Getty, Inc., the predecessor of Getty Oil Co. (Getty Oil). JPG's mother owned five $500,000 promissory notes made by the corporation and payable to her. On Christmas Day 1934, in Los Angeles, JPG and his mother entered into an oral agreement for the joint establishment of an irrevocable inter vivos spendthrift trust (the 1934 Trust) to which each, as a trustor, would contribute assets. JPG agreed to contribute and/or sell about $1 million of his stock in George F. Getty, Inc.; his mother agreed to contribute the $2,500,000 of promissory notes.

The 1934 Trust was created as a vehicle to transfer control of the Getty family oil business to JPG, who was named trustee of the trust, while providing his mother with assurance as to the financial security of JPG and his issue. The trust provided that the income would be paid to JPG during his lifetime and then to his children or their descendants in certain proportions. The 1934 Trust also provided that JPG could waive income in whole or in part. Should he so renounce his income interest during his lifetime, and with respect to all of the 1934 Trust's income following JPG's death, such income was to be allocated annually as follows: $9,000 each to his third and fourth sons, Eugene Paul Getty (EPG) and Gordon Peter Getty (GPG) (or their respective issue); $3,000 to petitioner (or his

issue); and the remainder of the 1934 Trust's income equally to EPG, GPG, GFG, and any after-born child of JPG (or their respective issue). Thus, petitioner's half brothers (or their issue) shared equally in income distributions from the 1934 Trust after distribution of the first $21,000. GFG did not share in the first $21,000 of income from the 1934 Trust because he was the only grandchild provided for in the will of GG, Sr. Petitioner's income interest was limited in all events to $3,000 per year.

The 1934 Trust provides that it will terminate upon the death of the last to survive of JPG's sons. The then corpus of the 1934 Trust will be divided among all of JPG's grandchildren, per stirpes, with the same share to petitioner's children as to the children of the other sons.

On December 31, 1934, JPG executed a document waiving his right to income from the shares of stock he sold and/or contributed to the 1934 Trust. The effect of the waiver, under the terms of the 1934 Trust, was that approximately 20 percent of the income of the 1934 Trust was paid to income beneficiaries other than JPG during JPG's lifetime.

In 1935, at JPG's request, AHG and petitioner returned to California from Germany. On July 27, 1935, JPG executed a new will providing equally for petitioner with his other children.

JPG's mother, SCG, developed a close relationship with AHG and petitioner from 1935 until SCG's death on December 26, 1941. In 1941, JPG and SCG executed a supplement to the 1934 Trust. The supplement stated that the reason for petitioner's income interest being limited to $3,000 per year while his half brothers basically shared equally in the 1934 Trust's income (the inequality) was that petitioner was expected to inherit directly or indirectly from Helmle, who was then reputed to be wealthy.

At the time of AHG's marriage to JPG, Helmle was wealthy by German standards, but he lost his position as director general of a public utility known as "Badenwerks" when the Nazis came to power in January 1933. He was jailed in the fall of 1937 and turned his assets over to the German Government to avoid a prison term. He never regained his wealth. Petitioner never inherited anything from or through Helmle.

JPG was generally aware of Helmle's financial situation and of his problems with the Nazis when the 1934 Trust was executed, but SCG may not have been. When the 1934 Trust was executed, JPG was upset with AHG's financial demands and her attack on the validity of their divorce. He was also unhappy about petitioner's living in Germany.

In 1940, it was discovered that the 1934 Trust did not contain language declaring it to be irrevocable. If the 1934 Trust was revocable, SCG's contribution to the 1934 Trust might have been included in SCG's estate for Federal estate tax purposes. SCG wrote a letter (drafted by SCG's attorneys) to JPG in 1940, indicating that it was her intention at the time of the creation of the 1934 Trust that the 1934 Trust be irrevocable; but that, if the 1934 Trust was revocable, SCG wanted to revoke the 1934 Trust and dispose of her share of the trust estate "in a manner which is more pleasing to me at present than now provided by the Declaration of Trust." In 1940, the value of the 1934 Trust was approximately $9,400,000. By 1940, both SCG and JPG knew of Helmle's loss of income and assets.

On May 20, 1940, JPG, individually and as trustee of the 1934 Trust, brought an action (Getty I) against SCG and his four sons to declare the 1934 Trust irrevocable. Petitioner, then 11 years old, was represented in Getty I by his mother, AHG, as his guardian ad litem. Getty I was "friendly" litigation and was instituted and decided in only 11 days. The 1934 Trust was declared irrevocable on May 31, 1940.

AHG, as guardian for petitioner, learned for the first time about the 1934 Trust and the inequality in Getty I. At JPG's request, she consulted with the law firm of Gibson, Dunn & Crutcher. AHG refused to sign and deliver pleadings in Getty I that JPG asked her to sign until after she obtained JPG's assurance that he would see to it that the inequality was eliminated.

Soon after Getty I, JPG's attorneys drafted a new will for SCG. Correspondence between David Hecht (Hecht) (attorney for JPG and Getty Oil), David Staples (Staples) (in-house counsel for Getty Oil), and Thomas Dockweiler (attorney for JPG and SCG) in June, July, and August 1940 dealt with SCG's will and a proposal to eliminate the inequality.

SCG executed a will on August 7, 1940, providing for testamentary trusts of $50,000 each for EPG and GPG, and $200,000 for petitioner. The residue of SCG's estate was to be in trust with income for life to JPG, and thereafter with income to go equally to JPG's sons, including petitioner. The disparity in the size of the grandsons' trusts was generally to remedy the inequality that would exist until the death of JPG. SCG died on December 26, 1941, leaving an estate valued at approximately $1,700,000.

In 1948, JPG commenced an action to revoke his 1941 resignation as trustee and appointment of successor trustees of the 1934 Trust (Getty II). Petitioner was then 18 years old. Petitioner then learned for the first time about the inequality from AHG. When petitioner spoke to JPG about the inequality, he was assured that JPG intended to eliminate the inequality. Similar assurances were given to petitioner by JPG periodically thereafter.

In 1948 Hecht, AHG, petitioner, and JPG went to Mexico to "straighten out" the divorce. While in Mexico, Hecht assured petitioner that the inequality would be corrected.

Petitioner's trust created by his grandmother terminated in 1959, when he attained age 30, and he received at that time assets valued at approximately $1,500,000.

Petitioner continued to have conversations with JPG about the inequality. JPG indicated in 1960 that petitioner was "ahead" of his brothers because he received more money from his grandmother's testamentary trust than they did. According to JPG, petitioner was "ahead" because he received capital (principal) as opposed to income. This type of conversation took place relatively infrequently in the 1960's but more often in the 1970's.

JPG died on June 5, 1976, leaving an estate valued at about $760 million (the estate). Petitioner was named as one of three coexecutors of the estate and eventually collected an executor's commission of approximately $4,350,000. The other coexecutors were GPG and Title Insurance & Trust Co. JPG's will authorized any two of the three coexecutors to act on behalf of the estate.

In his will, JPG left petitioner 2,000 shares of Getty Oil stock valued as of the date of death at about $330,000, some personal effects, and a life interest in a home in Italy.

The home was eventually sold, and petitioner received about $1,500,000. JPG's other sons received only nominal bequests under JPG's will, and no son other than petitioner received shares of Getty Oil stock.

After certain minor individual bequests, JPG's will left the residue of his estate directly to the trustees of the J. Paul Getty Museum (the museum) to become part of the museum's endowment fund. The residue of the estate consisted of approximately 20 percent of all of the outstanding shares of Getty Oil stock. The museum received in excess of $1.2 billion from the estate valued at the dates of distribution.

After JPG's death, all of the income of the 1934 Trust was distributed to the other income beneficiaries. Petitioner has never received more than $3,000 per year from the 1934 Trust.

At the time of JPG's death, the 1934 Trust consisted of approximately 32 million shares of Getty Oil valued at approximately $1.3 billion with a dividend of millions of dollars per year. Petitioner believed that JPG's will failed to equalize the treatment of petitioner viz-à-viz his brothers with respect to the income distributions his brothers would receive from the 1934 Trust after the death of their father.

After concluding that JPG's will did not remedy the inequality, petitioner consulted Ira D. Riskin (Riskin) of the firm of Magaram, Riskin, Wayne & Minikes, a professional law corporation (MRW&M) in 1976. After a preliminary analysis, Riskin agreed to pursue petitioner's claims against the 1934 Trust and its beneficiaries, but not against the estate or the museum. Riskin initially advised petitioner that there appeared to be insufficient evidence to support a cause of action against the estate or museum. Riskin also advised petitioner that consideration had been given to possible claims against the will or beneficiaries under the will based upon the promise of JPG to make a will, but such a contention would put petitioner in a conflict of interest with his duties as an executor which could result in his removal and the loss of his share of the executor's fee. A contingent fee agreement was entered into, covering causes of action against the beneficiaries of the 1934 Trust and/or reforming the 1934 Trust.

In the course of his investigation of petitioner's claims, during November or December of 1978, the correspondence between JPG's attorneys concerning SCG's will (the Hecht letters) was discovered by Riskin. Petitioner was advised by Riskin that he had a colorable claim to seek redress from the museum. After Riskin's discovery of the Hecht letters, a new fee agreement was executed between petitioner and MRW&M, providing for MRW&M to receive a contingent fee from any recovery or settlement arising from an action against the estate or the museum.

On June 1, 1979, petitioner, individually and as guardian ad litem for his children, filed a complaint in Los Angeles County Superior Court (1979 Action). The complaint contained three counts. The defendants in count I were the trustees and income beneficiaries of the 1934 Trust. The defendants in count II were the trustees and beneficiaries of the 1934 Trust. The only defendants in count III were the trustees of the museum.

In count I of the complaint, petitioner sought to impose a constructive trust upon one-quarter of the income received by the beneficiaries of the 1934 Trust from the death of JPG until termination of the 1934 Trust. In count I, petitioner alleged: (1) That JPG had agreed with SCG to treat SCG's grandchildren fairly, justly, and equally in all respects with respect to the trust; (2) that the trust instrument failed to accurately reflect all of the terms of the agreement between JPG and SCG, especially with regard to what would happen if petitioner did not inherit substantial wealth from his maternal grandfather; (3) that JPG had induced SCG not to take any action in 1940 to equalize petitioner, through reforming the trust instrument or otherwise, by promising SCG that he, JPG, would equalize petitioner; (4) that JPG promised AHG and petitioner that he would equalize petitioner; and (5) that JPG had breached his fiduciary and confidential relationship with SCG and with petitioner.

In count II of the complaint, petitioner sought a reformation of the trust to reflect SCG's alleged true intent—that petitioner was to share equally in income. The same basic factual allegations contained in count I were incorporated by reference into count II.

In count III, petitioner sought to impose a constructive trust on the assets received and to be received by the museum from the estate of JPG and all income derived therefrom in an amount equal to the amount of income received by or credited to each of JPG's other children (or their issue) from the 1934 Trust from JPG's death until the termination of the 1934 Trust. Count III incorporated the factual assertions of count I. It asserted that JPG promised SCG that he would provide in his will for "income" to petitioner in an amount equal to that received by his other children from the trust following JPG's death, and that SCG, relying on JPG's promise, did not rescind that trust or provide in her will to equalize petitioner. In count III, it was specifically alleged that JPG had promised to SCG that he would provide in his will for "income to * * * [petitioner] or his issue in an amount equal to that received by his other children and their issue from the Family Trust following J. Paul's death."

The prayer for relief in paragraph C.7. of the complaint was as follows:

C. *Count III*

7. That the Court declare that the trustees of the Museum are constructive trustees of the assets received and to be received from the estate of J. PAUL GETTY and all income derived therefrom in an amount equal to the amount of income received by or credited to each of J. PAUL'S other children (or their issue by right of representation) from the Family Trust since June 5, 1976 until the termination of the Family Trust.

Petitioner did not seek to set aside JPG's will or assert a direct claim against JPG's estate because petitioner's counsel (1) felt that the action against the museum as the residuary beneficiary of the estate was the better form of action under California law as compared to an action against the estate, (2) did not want petitioner to take a position adverse to that of the estate given petitioner's fiduciary obligations as a coexecutor of the estate, and (3) did not want to jeopardize petitioner's fee as coexecutor.

On June 4 to 5, 1980, the trustees of the museum (other than petitioner and GPG) voted unanimously to enter into a proposed settlement agreement with petitioner. The trustees voted to accept the settlement following the presentation of

Bruce Bevan (Bevan) of Musick, Peeler & Garrett, counsel to the museum; Bevan indicated to the trustees that there was a substantial likelihood that, based upon all of the available evidence that might be produced at trial, the relief requested in count III of the complaint might be granted.

Certain of the trustees, including Stuart Peeler (Peeler) and J. Patrick Whaley (Whaley), as well as the museum's counsel, Whaley, Bevan, and Edward A. Landry (Landry), had detailed knowledge of the basis of petitioner's claim because of their prior association with JPG (and his business associates); with AHF and SCG; with Musick, Peeler & Garrett; and with each other, as well as independent factual investigation. While each had a slightly different version of the events that occurred in 1940 and the related background, all shared the view that petitioner's claim was a claim to recover an equalizing bequest promised by JPG. All also agreed that the promise by JPG to equalize petitioner was in fact made, or that there was at least a possibility that it was made, and that petitioner may have been able to prove such a promise if his action proceeded to trial. The other trustees had more limited knowledge of the background events relating to count III; when voting for the settlement, they were influenced by conversations with and the recommendations of counsel and the other trustees with more specific knowledge.

On June 5, 1980, the museum and petitioner entered into a settlement agreement (settlement agreement) whereby petitioner dismissed count III of the complaint against the museum with prejudice in exchange for the payment of $10 million. Paragraph A of the settlement agreement recited:

A. A dispute has arisen between * * * [petitioner], individually, and as Guardian Ad Litem for his children, and the Trustees [of the Museum] in their capacity as such. [Petitioner,] * * * individually, and as Guardian Ad Litem for his children, has filed an action in the Superior Court of California, County of Los Angeles, Civil No. C286401, against the Trustees and other parties ("Getty v. Getty") seeking to enforce these claims, including but not limited to claims to an inheritance from the estate of J. Paul Getty, Deceased, arising out of an alleged contract by said J. Paul Getty to leave a portion of his estate to * * * [petitioner] or his issue. The Trustees deny the validity of these claims. * * *

A dismissal of count III was filed with the California court on July 10, 1980. The museum paid the $10 million to

petitioner entirely out of its funds (not out of the funds it received from the estate or out of income the estate generated).

Petitioners did not include the $10 million settlement in their reported taxable income for 1980.

## OPINION

Petitioner received $10 million in settlement of his claim against the museum. The income tax consequences of the museum's payment depend upon "in lieu of what" the payment was made. See *Raytheon Production Corp. v. Commissioner*, 144 F.2d 110 (1st Cir. 1944), affg. 1 T.C. 952 (1943). If, as petitioner alleges, the proceeds of petitioner's settlement with the museum were received in lieu of an outright bequest, the amount of the payment was properly excluded from his gross income. Sec. 102(a).[1] If, on the other hand, the museum's payment to petitioner was in lieu of an income interest in a testamentary trust, the amount of the payment must be included in petitioner's gross income. Sec. 102(b).[2]

### I

Respondent relies on *Commissioner v. Estate of Vease*, 314 F.2d 79 (9th Cir. 1963), to argue that, as a matter of law, petitioner's settlement with the museum did not constitute a bequest, devise, or inheritance because petitioner's attorneys did not choose to challenge directly J. Paul Getty's will. At the heart of respondent's argument is the *Vease* court's interpretation of a principle established in

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the year in issue.

[2] SEC. 102. GIFTS AND INHERITANCES.

(a) GENERAL RULE.—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.

(b) INCOME.—Subsection (a) shall not exclude from gross income—

(1) the income from any property referred to in subsection (a); or

(2) where the gift, bequest, devise, or inheritance is of income from property, the amount of such income.

Where, under the terms of the gift, bequest, devise, or inheritance, the payment, crediting, or distribution thereof is to be made at intervals, then, to the extent that it is paid or credited or to be distributed out of income from property, it shall be treated for purposes of paragraph (2) as a gift, bequest, devise, or inheritance of income from property. Any amount included in the gross income of a beneficiary under subchapter J shall be treated for purposes of paragraph (2) as a gift, bequest, devise, or inheritance of income from property.

*Lyeth v. Hoey,* 305 U.S. 188 (1938). If respondent's analysis of *Vease* is correct, that case controls our resolution of the issue for decision here. *Golsen v. Commissioner,* 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

In *Lyeth v. Hoey,* the taxpayer received a small legacy from his grandmother, who left her $3 million residuary estate to a trust established to preserve "the records of the earthly life of Mary Baker Eddy" (305 U.S. at 189), the founder of the Christian Science religion. The taxpayer joined other heirs in opposition to probate of the decedent's will. Eventually, the parties involved entered into a settlement in which the decedent's individual heirs and the trust effectively split the estate's assets between them. The Commissioner determined that the cash and stock received by the taxpayer as a result of the settlement must be included in the taxpayer's income.

The Supreme Court disagreed. The Court observed that "In exempting from the income tax the value of property acquired by 'bequest, devise, or inheritance,' Congress used comprehensive terms embracing all acquisitions in the devolution of a decedent's estate." *Lyeth v. Hoey,* 305 U.S. at 194. The Court then disregarded the form of the taxpayer's challenge to his grandmother's will to focus on his status as an heir. The Court concluded that:

The portion of the decedent's property which petitioner obtained under the compromise did not come to him through the testator's will. That portion he obtained because of his heirship and to that extent he took in spite of the will and as in case of intestacy. * * * [305 U.S. at 196.]

The Court held that the taxpayer had properly excluded the settlement proceeds from income.

In *Estate of Vease,* the issue for decision was whether certain trusts resulted from transfers by the decedent during her lifetime, or whether the trusts were the result of transfers from the estate of the decedent's grandfather made by reason of the decedent's standing as his heir. The decedent's grandfather had died leaving two wills: an earlier will that was valid and executed, and a later will that was invalid and unexecuted. The decedent and her family agreed to comply with the grandfather's last wishes as expressed in the unexecuted will. The executed will was admitted to probate, and the Probate Court issued an order of authoriza-

tion consistent with the family agreement. The decedent was dissatisfied with her inheritance under the unexecuted will, as implemented by the family agreement, and sued the other heirs. In settlement of the decedent's claims, the decedent was made the income beneficiary of certain newly established trusts. The Commissioner determined that the trusts were the result of a transfer of property made by the decedent during her lifetime and were therefore includable in her estate for tax purposes.

This Court applied the principle established by *Lyeth v. Hoey* to conclude that the decedent had received her life estate by inheritance. The Court of Appeals for the Ninth Circuit disagreed. The appellate court observed that the family agreement, not the devolution of the grandfather's estate, was the underlying source of the decedent's litigation with the other heirs.

> But * * * [the decedent], her sister, brothers and mother were all named in the executed will, which was the only will ever executed by * * * [the grandfather], and none of them challenged that will or any provision thereof. The basis of the family agreement was therefore not the standing of an heir or heirs to contest the will as a whole, or of a beneficiary under a previous will to question a provision of a later will. Rather, it was the standing of each, as a beneficiary under the executed will, to agree upon a disposition of the property bequeathed and devised to all of them thereunder in a manner different from that provided in the will.
>
> The resulting agreement was nothing more than a voluntary rearrangement of property interests acquired under an admittedly valid will, concluded without duress of unsatisfied claims. Under these circumstances the transfer to the trusts must be deemed to have been made from property each had received from the estate.
>
> [314 F.2d at 86-87. Fn. ref. omitted.]

The Court of Appeals concluded that the principle set forth in *Lyeth v. Hoey* was inapplicable.

The Court of Appeals did not limit the broad sweep of the Supreme Court's holding in *Lyeth v. Hoey*. The appellate court distinguished *Lyeth v. Hoey*, because, in the case before it, the decedent never questioned the devolution of her grandfather's estate pursuant to the executed will. The decedent instead disagreed with the implementation of the unexecuted will pursuant to the family agreement. The principle established in *Lyeth v. Hoey*, was not applicable

because the decedent did not receive the proceeds of her settlement with the other heirs "in lieu of" a bequest, devise, or inheritance. Rather, the settlement proceeds were received "in lieu of" a reallocation of inherited property pursuant to a contract.

In this case, as in *Lyeth v. Hoey,* and in contrast to *Estate of Vease,* petitioner sued the museum as an heir of J. Paul Getty, not as a dissatisfied party to a contract. Respondent emphasizes that petitioner, acting on the advice of his attorneys, chose to file suit against the residuary beneficiary of his father's estate, rather than the estate, itself. This is a distinction without a difference. Under California law, petitioner was entitled to proceed against the museum in his status as J. Paul Getty's heir. *Day v. Greene,* 59 Cal. 2d 404, 380 P.2d 385 (1963); *Brown v. Superior Court,* 34 Cal. 2d 559, 212 P.2d 878 (1949). Moreover, as the Supreme Court recognized in *Lyeth v. Hoey,* the issue of whether property—

has been "acquired by inheritance" within the meaning of the federal statute necessarily is a federal question. It is not determined by local characterization.

\* \* \* Congress establishes its own criteria and the state law may control only when the federal taxing act by express language or necessary implication makes its operation dependent upon state law. \* \* \*

[305 U.S. at 193-194.]

Petitioner alternatively argues that he was seeking property in lieu of either a gift, i.e., as a third-party donee beneficiary of a contract to make a will, or as a bequest, pursuant to a contract to make a will. At the time his complaint was filed, the 2-year period of limitations on contract actions had run, and his attorneys selected a cause of action to which a 3-year period of limitations would apply. Respondent seizes on characterization of the suit for constructive trust and breach of fiduciary duty as sounding in tort. The technicalities of California pleading and practice do not control our decision. Petitioner challenged the "devolution of a decedent's estate," not "a voluntary rearrangement of property interests acquired under an admittedly valid will." *Estate of Vease* does not provide the answer in this case. See generally *Parker v. United States,*

215 Ct. Cl. 773, 573 F.2d 42 (1978); *United States v. Gavin*, 159 F.2d 613 (9th Cir. 1947).

## II

What, then, did petitioner seek in count III of his complaint? Landry, an attorney for the museum, testified that petitioner "was attempting to get some justice and he was trying to get it from the 34 Trust and the Museum and wherever he could get it." Certainly the language of count III of the complaint tends to prove that petitioner was seeking income from the assets of the estate. Our analysis, however, does not end with the complaint. We have also examined the facts and circumstances surrounding petitioner's claim against the museum and have considered particularly the testimony of the participants in petitioner's litigation against the museum.

Peeler, a trustee for the museum, testified:

I believed that Ronald was basically seeking from the Museum, as the * * * primary distributee of the estate and, thus, as the estate's successor in interest, the equivalent of what he would have received had he been a full income beneficiary of the 1934 Trust, and when I say equivalent, I'm thinking not in terms of an income interest, but as something commensurate with what I had earlier discussed with J. Paul Getty on many occasions; namely, a specific bequest of Getty stock in a sum or value which would do a rough justice equivalent of what Ronald would otherwise have gotten had he been a full income beneficiary of the 1934 Trust.

Riskin, petitioner's attorney, testified:

Some time shortly following the death of J. Paul Getty our firm was asked to look into possible claims that Mr. Ronald Getty had because he had been omitted from a trust, I guess it's referred to as the "1934 Trust", * * *

\* \* \* \* \* \* \*

[The Hecht letter] * * * for the first time, gave us a clue to the fact that the equalization had proceeded in two stages. That there was an intent to equalize Ronald Getty with regard to income during his father's lifetime, which referred to 20 percent of the income from the trust, really, and then there was a separate reference to equalization following J. Paul Getty's death, and, of course, that was the portion which had not been done. * * *

\* \* \* \* \* \* \*

* * * I was seeking an amount of money measured by the income the other children were receiving; and, in fact, what's interesting about that is that the measures differ under the early counts, and under the later, but it would have been a fixed amount.

We are persuaded that petitioner, his mother, his attorneys, and the museum trustees and attorneys believed that JPG had promised to provide for petitioner by will in order to remedy the inequality. Further, they believed that the remedy would be in the form of an outright bequest, probably of Getty Oil stock. We do not know, of course, whether JPG believed that he had performed his promise by the bequest of stock actually made in his will. Petitioner obviously felt that JPG had not adequately performed. Thus, petitioner filed a lawsuit seeking, among other things, a sum of money.

The difficult and decisive question is whether what petitioner ultimately received should be treated as a substitute for (1) the bequest not made by JPG or (2) the original claim to an income interest not received. Alternatively stated, can we conclude on the evidence or as a matter of law that the money received was in lieu of an inheritance not taxable under section 102(a) rather than an inheritance taxable under section 102(b)(2)?

The agreement settling the 1979 Action recited that petitioner's lawsuit was based on claims including, but not limited to, a claim to an "inheritance" from JPG. Respondent argues that the term could encompass an income interest in a testamentary trust, and petitioners argue that such is not the ordinary meaning of the word. In the context of section 102, however, inheritance is used to cover both outright bequests and income received from a decedent.

Respondent maintains that the ambivalence of the record is fatal to petitioner's cause:

when equal weight is given to the conflicting evidence in this case, it is not possible to reach a firm or clear answer to the question of exactly what petitioner sought in his suit against the Museum, namely, whether he was seeking to acquire an outright bequest or gift he should have received but did not, or equalizing income he should have received but did not. Accordingly, since what petitioner did receive from the Museum in settlement cannot clearly be characterized, petitioner has failed to

meet his strict burden of proof and has not established that he falls within the exclusion provisions under I.R.C. sec. 102(a). * * *

Respondent relies on two basic principles in arguing that we must conclude that the amount received by petitioner was taxable. First, petitioners have the burden of proof. *Rockwell v. Commissioner,* 512 F.2d 882 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Rule 142(a), Tax Court Rules of Practice and Procedure. Second, exemptions from tax are to be narrowly construed. *Bingler v. Johnson,* 394 U.S. 741, 752 (1969).

Respondent analyzes the precedents and summarizes them as follows:

In *every case* to which the *Lyeth* doctrine has been applied to resolve a Section 102 dispute, it was clear that the underlying claim involved specific property which, had the claimant been successful, would have been deemed to have been received or recovered "by gift, bequest, devise, or inheritance" (Section 102(a) *or* as income from such property (Section 102(b)) *or* as a "gift, bequest, devise, or inheritance * * * of income from property" (Section 102(b)(2)) (or their predecessors in the Internal Revenue Code), depending on which conclusion the claimant sought to prove. In other words, in each case where the *Lyeth* doctrine has been applied to Section 102, the Court could determine that the property in lieu of which settlement proceeds were paid was property that could be clearly classified under either Section 102(a), 102(b)(1) or 102(b)(2). If a Court deemed only a portion of the sought-after recovery to be by outright bequest, inheritance, or gift, or in lieu thereof, only a corresponding amount of the settlement proceeds was excluded from income under Section 102(a). * * *

We agree with respondent's analysis of prior cases. For example, in *Harrison v. Commissioner,* 119 F.2d 963 (7th Cir. 1941), affg. 41 B.T.A. 1217 (1940), a surviving spouse was unhappy with the provisions of her husband's will because it did not comply with a prenuptial agreement in which he agreed to establish a trust that would pay all of its income to her for life. She was entitled, under Illinois law, to renounce the will and take one-half of the estate. She gave up that right in an agreement with the charitable beneficiaries of the estate, in which they agreed to pay certain income to her. The Court held that the amount received was taxable under the predecessor of section 102(b), after concluding that the interest that was the subject of the taxpayer's claim was an interest in income.

Petitioners attempt to distinguish *Harrison* on the ground that petitioner received a lump sum rather than income in his settlement with the museum. The correct focus, however, as in *Harrison,* is on what the payment was in lieu of rather than on the form in which it was received. See also *Parker v. United States, supra; United States v. Gavin, supra.*

On careful consideration of the historical facts and circumstances surrounding the 1979 litigation, the decided cases, and petitioners' arguments, we conclude that petitioners have not overcome the force of the principles relied on by respondent. The inescapable factual conclusion is that the "outright bequest" was, at most, a possible means of compensating petitioner for income that he was not receiving. If JPG had performed his promise, he probably, but not necessarily, would have done it by an outright bequest; but he did not. So petitioner was still left seeking compensation for lost income. Sums received in replacement of taxable income are generally taxable. *Moholy v. United States,* 235 F.2d 562, 564 (9th Cir. 1956). We cannot find an exemption for tax based on so tenuous a basis as: what might have been done would not have been taxable. As respondent argues, doubt or ambiguity about characterization of funds received is resolved in favor of taxability. *United States v. Stewart,* 311 U.S. 60 (1940).

### III

Petitioners argue that even if the underlying nature of petitioner's claim is an equalizing interest in income, the lump-sum settlement of such a claim would be acquired tax free under section 102(a) by bequest. In this regard, they rely on *Quigley v. Commissioner,* 143 F.2d 27 (7th Cir. 1944), revg. 1 T.C. 831 (1943). In that case, the taxpayer's father had died in 1917 leaving an estate of approximately $2 million. Had the father died intestate, her share would have been approximately $400,000. He left a will, however, creating several trusts; the trust created for the taxpayer was smaller than those created for her brothers. After she threatened to contest the will, her brothers executed a contract in which they agreed to pay her, from the income of the trusts created for them, an equalizing amount.

Twenty-two years later, in 1939, another agreement was made between the taxpayer and her brothers. For $20,000 cash in hand, she released them from further payments under the 1917 agreement. The question presented was whether the $20,000 payment was taxable income. There was no dispute that the annual income that the taxpayer had received from 1917 to 1939 was taxable, and she had reported and paid tax on the amounts received. The Court of Appeals, however, stated that the contract rights were a capital asset and concluded that the sale of the rights in 1939 did not give rise to a tax. Because the amount received did not exceed the value of what the taxpayer had given up in 1917, there was no gain.

The reasoning of *Quigley,* however, does not help in this case. Petitioner did not receive, as an inheritance, either an outright bequest of property or an income interest of property. He received $10 million in lieu of either an outright bequest or an inheritance of income. It is receipt of that $10 million with which we are concerned, not the consequences of ultimate disposition of that asset.

For the same reasons, *Quigley* does not support petitioner's claim that the amount received from the museum should be taxed as a capital gain rather than as ordinary income. The other cases cited by petitioner, *McAllister v. Commissioner,* 157 F.2d 235 (2d Cir. 1946), and *Bell's Estate v. Commissioner,* 137 F.2d 454 (8th Cir. 1943), similarly involved a surrender or transfer of a vested interest in exchange for a cash payment. Here petitioner did not have, and was not giving up, anything that could be characterized as a capital asset. He had a claim to money that might have been satisfied in various ways, including an outright bequest or a provision for income, but was measured by income that, if received, would have been taxable as ordinary income. Again, we cannot reach conclusions on the basis of what might have been. The origin, goal, and measure of petitioner's claim were income. Intermediate alternatives, such as a bequest of stock or establishment of an interest in the testamentary trust, might have resulted in a nontaxable receipt of a capital asset by petitioner. But neither of those alternatives occurred.

Respondent has conceded that petitioner is entitled to deduct $2 million paid to his attorneys in relation to the 1979 litigation. Therefore,

*Decision will be entered under Rule 155.*