ESTATE OF ILA JEAN ANDERSON, DECEASED, JAMES R. ANDERSON, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Anderson v. Commissioner
Docket Nos. 33579-87, 33656-87.
United States Tax Court
T.C. Memo 1988-423; 1988 Tax Ct. Memo LEXIS 454; 56 T.C.M. (CCH) 78; T.C.M. (RIA) 88423; September 7, 1988. *454 Decedent's husband (H) died on August 8, 1973, without an opportunity to change his will, which left his entire estate, largely his community property half interest, to decedent. To carry out decedent's last wishes, decedent and her only son (S) agreed not to probate H's will, both signing and filing an affidavit of heirship to that effect. In December 1973, decedent transferred her one-half interest in certain farm equipment to S. On February 5, 1974, S and his wife transferred to decedent a life estate in all property S would receive pursuant to the Texas intestacy laws. On that same date, decedent filed a document purporting to disclaim her interest in property passing to her under H's will. Held: the transaction involving conveyance of life estate is independent of the transfer of farm equipment, the agreement not to probate will, and decedent's disclaimer. Held further: decedent's disclaimer is a valid partial disclaimer under sec. 37A(e), Texas Probate Code, and is valid for Federal gift tax purposes. Held further: decedent's life estate in certain real property was not retained by her and that property is not included in her gross estate pursuant to sec. 2036. Held *455 further: value of certain real property determined. Clarence P. Brazill, Jr., for the petitioner. Henry C. Griego, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By statutory notice dated July 13, 1987, respondent determined a deficiency in petitioner's estate tax of $ 96,371.06. By separate statutory notice of even date, respondent determined a deficiency in petitioner's gift tax for the calendar quarter ending March 31, 1974, in the amount of $ 22,226.86. The first issue is whether the agreement between Ila Jean Anderson and James R. Anderson to disregard the will of Raymond C. Anderson, so that each would take as if the latter had died intestate, constitutes a transfer by Ila Jean Anderson for gift tax purposes. If so, we must determine if Ila Jean Anderson made a valid disclaimer of benefits under that will. We must also determine if the value of certain real property in which Ila Jean Anderson held a life estate at her death is includable in her gross estate pursuant to section 2036. [1] Finally, under the circumstances of this case, we must determine the value of that real property. For the sake of convenience, our findings of fact and *456 opinion concerning the first three issues are treated first and the findings of fact and opinion on the valuation issue are combined and determined last. Family Settlement Agreement, Disclaimer, and Section 2036
FINDING OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. At the time of her death on January 28, 1984, Ila Jean Anderson, (decedent) was a resident of Lamesa, Texas. On August 25, 1960, decedent and her husband, Raymond C. Anderson (Mr. Anderson), executed a joint and mutual will leaving all their property to each other, the survivor to be the executor of the other's estate. At the time the will was executed, their only child, James Ray Anderson (James Anderson), was approximately 10 years old. In June or July 1973, Mr. Anderson was diagnosed as having terminal cancer and was told he had 9 to 10 months to live. By this time, *457 James Anderson had attained majority, had received a bachelor's degree in agribusiness, and had started farming with his father the real property which is the subject of this case. Although Mr. Anderson's illness was terminal, he and his family thought there was sufficient time to get his affairs in order. After his diagnosis and while still in the hospital, Mr. Anderson expressed a desire to change his will so as to include his son and his grandson. However, shortly before Mr. Anderson was to leave the hospital, he lapsed into a coma. His family was told that he had only a short time to live. After it became apparent that Mr. Anderson would never be able to change his will, his family decided that the best way to carry out his wishes regarding his property was to refrain from probating his will and allow his property to pass under the Texas laws of intestate succession. At the time of his death on August 8, 1973, Mr. Anderson had a community interest in three tracts of land in Dawson County, Texas, of approximately 240, 160, and 80 acres, a separate interest in a 154-acre tract in Dawson County, and a community interest in personal property, which included certain farm equipment. *458 The arrangement contemplated that James Anderson would farm all the land and divide the proceeds in accordance with existing custom. After Mr. Anderson's death, decedent and James Anderson went for advice to Stansell Clement (Clement), an attorney in Lamesa, Texas, who had represented Mr. Anderson for some years prior to his death. Clement drafted what petitioner refers to as an affidavit of heirship stating "There has been no administration had on the Estate of R. C. Anderson and none is contemplated at this time for the reason there appears to be no necessity therefor." Decedent and James Anderson executed and filed this document on August 27, 1973, in the Dawson County deed records. By executing this document, decedent and James Anderson sought to memorialize their intent that the Texas law of intestacy should govern the distribution of Mr. Anderson's estate. [2] *459 Decedent and James Anderson were both under the impression that the affidavit of heirship was sufficient to prevent title vesting in decedent pursuant to Mr. Anderson's will. In the months after Mr. Anderson's death, James Anderson kept decedent apprised of her part of the expenses attendant on the farm equipment, in which they each had an interest under Texas law. Decedent became aggravated with this arrangement, and gave the equipment to James Anderson outright shortly before the beginning of the year 1974. James Anderson placed all of the property on his Federal income tax depreciation schedule as of January 1, 1974. Also around the end of 1973 or beginning of 1974, James Anderson and his wife Ann Anderson became convinced that the level of income from decedent's intestate share of Mr. Anderson's estate together with her community interest, would not be sufficient to meet her needs. Once again James Anderson sought advice from Clement as to the best way to provide decedent with an increased share of income from the property. Clement suggested that James and Ann [3] *460 convey a life estate to decedent. [4] Clement prepared such a deed, which was duly executed by James and Ann Anderson on February 5, 1974, and recorded the next day. In late 1973 or January 1974, Clement attended a number of continuing legal education seminars, at which he learned of legal issues which he thought were relevant to the Andersons. At one of these seminars he became aware that under Texas law a will could be offered for probate at any time for 4 years after the testator's death. He also learned about section 37A of the Texas Probate Code[5] which provided a statutory method for disclaiming testamentary devises and intestate successions. Remembering the affidavit of heirship executed by decedent and James Anderson on August 27, 1973, and fearing it to be insufficient, Clement contacted decedent, advising her that title to Mr. Anderson's property was "in limbo" and advising her to file a disclaimer complying with section 37A. Clement drafted a document for decedent's signature stating that "I decline *461 to accept under the last will and testament of R. C. Anderson and I do not intend to offer said will for probate." This disclaimer was executed on February 5, 1974, at the same meeting at which James Anderson and his wife conveyed to decedent her life estate, and was filed the next day along with a copy of Mr. Anderson's will. Decedent died still possessed of the life estate on January 28, 1984. OPINION
1. Agreement to Disregard Will
The first issue is whether the agreement between decedent and James Anderson to disregard Mr. Anderson's will, so that his property would pass to them under the Texas laws of intestate succession was a transfer taxable as a gift under section 2501. Petitioner contends that the Texas "family settlement doctrine" as set forth in Stringfellow v. Early,15 Tex. Civ. App. 597, 40 S.W. 871 (1897), and its progeny operates to pass all right, title, and interest in the appropriate intestate shares of Mr. Anderson's property to his son and to his widow, the decedent, with no interest passing from the decedent to James Anderson. In response, respondent argues *462 that the court's opinion in Price v. United States,470 F. Supp. 136 (N.D. Tex. 1979), affd. per curiam 610 F.2d 383 (5th Cir. 1980), is controlling and the family settlement doctrine, while preventing property interests from vesting for state law purposes, cannot have the same effect for Federal income tax purposes. [6] Under Texas law, a family settlement in which all the heirs and beneficiaries agree that a purported will shall not be probated is valid and enforceable. The agreement is no less effective as a bar to an action by one of the contracting parties to probate the instrument than undue influence or testamentary incapacity. * * * [Salmon v. Salmon,395 S.W. 2d 29, 32 (Tex. 1965).]
Both sides, in their original and supplemental trial memoranda and briefs have cited numerous Texas cases interpretative of this proposition. Petitioner argues that the family settlement doctrine creates the *463 legal interests at issue, and Federal law must tax them accordingly. Cf. Morgan v. Commissioner,309 U.S. 78 (1940); Estate of Wyly v. Commissioner,610 F.2d 1282 (5th Cir. 1980). While there is no doubt as to the validity of the family settlement doctrine under state law, it is not so precisely applied to the areas of Federal estate and gift taxation. The cases cited by the parties involved almost without exception intra-family disputes wherein a party to such a family settlement agreement sought relief from its provisions. Thus, the cases were decided almost exclusively as a matter of contract law. Indeed, in the first case espousing this doctrine, the Texas Court of Civil Appeals stated that Parties may make any contract with reference to their property rights that is not illegal, may adjust by compromise their differences and disputes concerning the same, and, as they bind themselves, so shall they be bound. It is difficult to understand why this cannot be effected by an agreement not to probate a will, or how it interferes with public policy. * * * [Stringfellow v. Early,40 S.W. at 874.] We last faced this question in Estate of Vease v. Commissioner,35 T.C. 1184 (1961), *464 revd. 314 F.2d 79 (9th Cir. 1963). In Estate of Vease, decedent's father died 18 months after executing a will and very shortly after informing his attorney of modifications he wished to be made to it. The attorney incorporated these modifications into a new will, which decedent's father did not have an opportunity to execute before he died. Shortly after the father's death, his attorney met with his widow and children, including decedent, who was then a minor. The attorney told the family that there was an executed will and and unexecuted will, but did not reveal the contents of either document to any family member. Nevertheless, the family decided unanimously to abide by the terms of the unexecuted will. At that moment the attorney wrote out in long hand form an agreement which the family members signed. The agreement was later redrafted and reexecuted pursuant to an order of a local probate court, and was executed on decedent's behalf by her court-appointed guardian. The executed will provided for specific bequests to decedent with 20 percent of the residue of her father's estate to be placed in a trust from which she was to receive the income plus not more than $ 5,000 *465 of principal annually, the principal to be distributed to her when she attained age 30. The unexecuted will made no specific bequests to decedent, but provided that 25 percent of the residue of her father's estate was to be placed in a trust from which she was to receive the income for life. The principal of the trust was never to be distributed to decedent, but under the terms of the unexecuted will was to be held for the benefit of her children as decedent may by will appoint, or failing such appointment to her children equally. We held that decedent received her life estate in the trust by reason of her standing as an heir, relying on Lyeth v. Hoey,305 U.S. 188 (1938). In so holding, we noted that family agreements were valid and favored as a matter of public policy under Michigan law. In reversing our decision, the Nine Circuit Court of Appeals found erroneous our reliance on Lyeth v. Hoey, stating that: One who has standing as an heir by intestacy, or as a beneficiary under a previous will, may make such standing the basis for a challenge of the will as a whole, or a claim with regard to some provision thereof. Property received from the estate in settlement of a bona fide *466 challenge or claim of this kind, in whatever amount and however conditioned as to disbursement or otherwise, may properly be said to be received by reason of such standing. * * * But [decedent], her sister, brothers and mother were all named in the executed will, which was the only will ever executed by [decedent's father], and none of them challenged that will or any provision thereof. The basis of the family agreement was therefore not the standing of an heir or heirs to contest the will as a whole, or of a beneficiary under a previous will to question a provision of a later will. Rather, it was the standing of each, as a beneficiary under the executed will, to agree upon a disposition of the property bequeathed and devised to all of them thereunder in a manner different from that provided in the will. [Commissioner v. Estate of Vease,314 F.2d 79, 86-87 (9th Cir. 1963).]
Since the executed will be decedent's father passed the interests in his property for Federal estate tax purposes, the court held that decedent's agreement to abide by the unexecuted will constituted a transfer in trust with decedent retaining a life estate. Therefore, the trust was includable in decedent's gross *467 estate pursuant to section 811(c) of the Internal Revenue Code of 1939, the predecessor of section 2036. We are not, however, required in this case to decide whether we will adopt the view of the Ninth Circuit or adhere to our position in Estate of Vease. The Fifth Circuit, to which the instant case is appealable, reached a result similar to the Ninth Circuit in Grossman v. Campbell,368 F.2d 206 (5th Cir. 1966). [7] In Grossman, decedent's wife had two children by a previous marriage. Decedent and his wife executed reciprocal wills in 1949. On April 29, 1954, decedent's wife wrote out and signed a holographic will leaving her entire estate to her children and grandchildren. On May 15, 1954, decedent and his wife each executed codicils referring to their 1949 wills. The wife then died on July 19, 1955. Upon discovery after her death of his wife's holographic will, decedent entered into an oral agreement with her children whereby he would receive the use of her property for his life, the remainder to pass to her children upon his death, along with all of his own property. In return, they would refrain from attempting to probate their mother's holographic will. The court framed *468 the determining issue as "[was] there an actual dispute as to the validity of the 1949 will out of which a good faith, valid and bona fide settlement arose?" Grossman v. Campbell, supra at 209. The court held that as a matter of Texas law, decedent's wife's holographic will was invalid since the May 15, 1954, codicil reviewed the earlier will. Due to the holographic will's invalidity, the court found that there could be no actual and bona fide dispute *469 between decedent and his wife's children, and held that "the resulting agreement was nothing more than a voluntary rearrangement of property interests acquired under an admittedly valid will, concluded without duress of unsatisfied claims." Grossman v. Campbell, supra at 210, quoting Commissioner v. Estate of Vease,314 F.2d 79, 87 (9th Cir. 1963). From the holding of the court of appeals in Grossman, it becomes apparent that the critical element in giving effect to such an agreement for Federal estate tax purposes is the existence of an actual and bona fide dispute among the parties to the agreement concerning disposition of the property. This should be no less true in gift tax cases, since the gift and estate taxes "are in pari materia and must be construed together." Estate of Sanford v. Commissioner,308 U.S. 39, 44 (1939). [8] There was no such dispute here, as decedent and James Anderson were motivated solely by their desire to give effect to Mr. Anderson's last wishes. While we might reach a different result by following our own decision in Commissioner v. Estate of Vease, supra, we are bound by the rule of Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), *470 cert. denied 404 U.S. 940 (1971), to follow the Fifth Circuit's position as set forth in Grossman.We therefore find that the agreement between decedent and James Anderson was the same type of voluntary rearrangement of property as referred to in Grossman, and that such a rearrangement of property is tantamout to a transfer to property by gift under by section 2501(a). [9] See Getty v. Commissioner, 91 T.C.    (filed July 27, 1988), slip op. at 20. While the agreement between decedent and James Anderson would, if otherwise effective, constitute a transfer of property to James Anderson, such a conclusion does not dispose of the case before us by reason of the execution of the disclaimer. [10] Disclaimers of property interests created by transfers made *471 before January 1, 1977, are governed by section 25.2511-1(c)(2), Gift Tax Regs. [11] Under those regulations, a valid disclaimer must be made within a reasonable time after gaining knowledge of the existence of the transfer, must be unequivocal, must be valid under state law, and the property must not have been previously accepted by the person making the disclaimer. Petitioner contends that decedent executed and duly filed a valid disclaimer as contemplated by section 25.2511-1(c)(2), Gift Tax Regs. Respondent contends that decedent's disclaimer is invalid as it fails to satisfy the regulation's requirement that such disclaimers be unequivocal and valid under local law. Particularly, respondent would collapse decedent's disclaimer and transfer of farm equipment and James Anderson's conveyance to decedent of a life estate into a simple exchange of the disclaimer *472 and farm equipment for the life estate. See Bel v. United States,452 F.2d 683 (5th Cir. 1971), cert. denied 406 U.S. 919 (1972). Thus respondent contends that the disclaimer was not unequivocal. We are not persuaded by respondent's argument that decedent's disclaimer was in exchange for the conveyance of a life estate. We have found the witnesses presenting testimony on this matter, particularly James Anderson and Clement, to be thoroughly credible and their testimony supported by objective facts. We are convinced that decedent thought that by executing the affidavit of heirship on August 27, 1988, she was in effect disclaiming what she would have taken under Raymond Anderson's will. By giving notice of her intent not to offer the will for probate, she sought to give legal effect to the oral agreement with her son to allow the property to pass by intestacy. We believe that decedent as well as James Anderson thought no further acts were necessary to effect this taking title and possession of a portion of Raymond Anderson's estate. That opinion was based on the erroneous advice of her attorney who prepared the document to give effect to the oral agreement. While James Anderson's *473 conveyance of a life estate to decedent may have been out of a perceived moral obligation, we think that neither party contemplated the conveyance as part of any bargain. Nor do we think the conveyance of a life estate was in consideration of decedent's conveyance of farm equipment to James Anderson. Decedent had little use for the farm equipment herself, and in any event made the conveyance after the thought all was taken care of concerning Mr. Anderson's real property and before either she or James Anderson became aware of the necessity for a conforming disclaimer. We believe that the agreement between decedent and James Anderson not to probate the will was not motivated by any desire to avoid taxes, nor do we think tax avoidance was even considered. Rather the agreement was motivated by the desire to give effect to the true last wishes of Raymond Anderson. In support of his position, respondent points out that the conveyance of the life estate and disclaimer were executed at the same place on the same day. However, it was the family attorney, Clement, who suggested the idea of conveying a life estate to decedent upon James Anderson's inquiry concerning an increased income for *474 her. It was also Clement who brought to decedent's attention the fact that title to Raymond Anderson's property would be "in limbo" until the running of the statute of limitations on probate of his will, 4 years after his death, and it was Clement who informed decedent of the need to execute what we find hereinbelow to be a valid disclaimer under Texas law. We are convinced by James Anderson's testimony that he knew nothing about the disclaimer until after seeking Clement's advice concerning an increase income for decedent. In short, we find each of these transactions, the agreement not to probate Mr. Anderson's will and attendant affidavit of heirship, the conveyance of a life estate to decedent, the conveyance of farm equipment to James Anderson, and decedent's execution of a disclaimer, to be unrelated transactions motivated by desires wholly independent of tax avoidance. The execution was scheduled by Clement on the same date merely for the convenience of all concerned. In support of his contention that James Anderson's conveyance of a life estate to decedent was in consideration of her disclaimer, respondent also points to certain correspondence between the parties and the *475 testimony of respondent's agent, Duane Neill and his supervisor, Carvin Adkins concerning a meeting on April 11, 1985, with James Anderson and Clement. At trial, Neill produced his handwritten notes of that meeting which reflect that there was an agreement between James Anderson and decedent for an exchange of farm equipment for a life estate. Neill's notes also reflect that decedent had told James Anderson that she felt insecure about the amount of income she was receiving from the property. Neill testified that he left this meeting under the impression and with the conclusion that the life estate was conveyed to decedent in consideration of her disclaimer despite the fact that no statement to this effect is reflected in Neill's notes, and he did not recall such a statement being made. [12] Adkins also testified at trial concerning his recollection of the April 11, 1985, meeting. He recalled his discussion with James Anderson and his impression that the latter conveyed a life estate to decedent in exchange for her disclaimer. While Adkins took notes of that meeting, they were for the *476 limited purpose of his evaluation of Neill and were destroyed shortly thereafter. His recollection was based upon his general impression of the meeting, his review of the correspondence in the file, and Neill's notes. Adkins was very specific in his testimony that the conveyance of the life estate was to be in exchange for a disclaimer, and not for the agreement not to probate the will. Both Neill and Adkins testified that they were surprised by what they thought were the many damaging admissions made by James Anderson. However, the fact that the conveyance of the life estate and the disclaimer were executed on the same day was the overwhelming factor in support of their impressions. Respondent further relies upon the following sentence from a letter from Clement to Adkins dated June 28, 1985: We do admit that James and his mother entered into an Agreement whereby he was to obtain his father's farming equipment which was inherited by reason of Mrs. Anderson's Disclaimer and which was included in the 1974 Income Tax Schedule of Depreciation for James Anderson.
Adkins testified that the words "Agreement" and "Disclaimer" triggered some recollection of the April 11 meeting. Had James *477 Anderson made an admission concerning the exchange of the disclaimer for the life estate, it would surely have found its way into Neill's notes. Its absence therefrom is too significant to ignore. We give little weight to the impressions and conclusions of respondent's agents when balanced against this persuasive objective evidence. We find that the evidence presented by petitioner is sufficient to overcome any negative inferences which may be drawn from the June 28, 1988, letter. We agree with Adkins that the sentence quoted above is at best ambiguous, but after weighing all the testimony concerning this letter, including that of Clement himself, we think that despite Neill's notes of the April 11 meeting, the quoted sentence does not make reference to any bargained-for exchange. It merely sought to identify the equipment with reference to decedent's mode of acquisition; i.e., through intestacy rather than under Mr. Anderson's will. We have commented earlier on the impression made upon us concerning the truthfulness and veracity of the witnesses called in petitioner's behalf. We find these witnesses to be sincere although unsophisticated in Federal estate and gift tax matters. *478 We doubt that any act undertaken by any person involved with the subject property was performed with more than the slightest concerns as to Federal estate and gift tax consequences. We are impressed with the fact that it was Clement who suggested the life estate in response to James Anderson's inquiry concerning an increased income for decedent. It was also Clement, not decedent or James Anderson, who initiated the execution of the February 5, 1974, disclaimer in order to correct his prior advice. The ignorance of and lack of concern for Federal estate and gift tax provisions on the part of decedent, James Anderson, and Clement further confirms that these transactions were independent of each other and not parts of a single transaction. Respondent next argues that the February 5, 1974, affidavit is not a valid disclaimer under state law. In order for a disclaimer to be valid under Texas law, it must meet the requirements of section 37A of the Texas Probate Code. The disclaimer must be a notarized written memorandum filed with the probate court in which execution of the will or administration of the estate is pending. It must be filed within 6 months of the date of death, with *479 a copy to be served on the decedent's personal representative or other legatees and devisees under certain circumstances. Section 37A also contains its own prohibition against acceptance prior to disclaimer. The disclaimer takes effect as of the date of death of the decedent and property passes as if the person disclaiming predeceased the decedent. Section 37A also provides for a partial disclaimer "with respect to property expressly described or referred to by category in such disclaimer * * * ." Sec. 37A, Tex. Probate Code Ann. (Vernon 1980). Respondent does not challenge the giving notice or the place of filing, and the parties have stipulated Raymond Anderson's date of death and the date of filing of the affidavit. The disclaimer was filed within 6 months of the date of death of the decedent's husband, which we find is a reasonable time as contemplated by the Secretary's regulations. Respondent argues that the February 5, 1974 document was not a valid full disclaimer, since property passed to decedent from Mr. Anderson's estate as evidenced by the martial deduction taken on the estate tax return. Respondent contends that neither was that document a valid partial disclaimer, *480 since it did not refer to disclaimed property specifically or by category as required by section 37A(e). While the language of that document is ambiguous, decedent, James Anderson, and Clement have always treated the document as a partial disclaimer superceding their oral agreement. We therefore resolve the ambiguities by reference to the contemporary construction of the document by those parties. Further, the document does not run afoul of section 37A(e). Decedent was the sole beneficiary under Mr. Anderson's will, a copy of which was attached to the disclaimer. By reference to the disclaimer, the will, and the Texas intestacy laws, the property disclaimed may be determinned with specificity. Finally, we find that decedent never accepted any property under Mr. Anderson's will. Under Texas law, "acceptance shall occur only if the person making such disclaimer has previously taken possession or exercised dominion and control of such property in the capacity of heir, legatee, devisee, or beneficiary." Sec. 37A(f), Texas Probate Code. In this case, decedent exercised such dominion and control only over property which she received by operation of the Texas laws of intestate succession, *481 and later, by conveyance from James Anderson. Furthermore, her intent from the date of Mr. Anderson's death was to relinquish possession and title to James Anderson over all but her intestate share. Consistent with this intent, decedent performed no act inconsistent with the disclaimer. Based upon the foregoing, none of Mr. Anderson's property, as described in his will, vested even momentarily in decedent. Because of the superceding disclaimer, the agreement to refrain from probating the will was a nullity for both state law and for Federal estate and gift tax purposes. Decedent made no gift to her son James Anderson. Although decedent died possessed of a life estate in certain real property, she did not "retain" a life estate in that property so as to make the value of the entire property includable in her estate under section 2036. See Estate of Myers v. Commissioner,T.C. Memo. 1968-200. [13] *482 Section 2036 requires that the life estate be retained or reserved; such retention or reservation contemplates a single transaction, in substance if not in form, which we have found not to be the case here. We find our petitioner on these issues. Valuation Issue
Petitioner has asked that this case be decided under our expedited treatment for valid reasons. Under the circumstances, we think such treatment is warranted. While the case is in fact disposed of by our finding for petitioner on the first three issues, should respondent appeal our decision concerning these legal issues and our decision be reversed, the case would then be required to be remanded to us for a determination of the fair market value of the real estate to be included in decedent's gross estate under section 2036. [14] *483 In order to avoid such a delay, we will determine the fair market value of such real property at this time on the hypothetical assumption that its value is includable in decedent's estate. The subject property consist s of three tracts which decedent held as community property with Mr. Anderson (the community property) and one tract which had been held by Mr. Anderson during his lifetime as separate property (the separate property). The community property consists of tracts of 240, 160, and 80 acres located approximately 7 miles south of Lamesa, Texas. These three tracts were each equipped with a pivot irrigation sprinkler system and consisted of predominantly fine sandy loam soil with areas of less productive soils. These tracts were infested with nematodes, which caused root damage to cotton plants that were not resistant to these microscopic organisms to some degree. These tracts also contained washes where eroded soils had been deposited. The separate property was a 154-acre tract located approximately 14 miles southeast of Lamesa. The slope of the land and its soil makeup *484 make this tract inferior to the community property. This track was also irrigated with a pivot sprinkler system. Section 20.2031-1(b), Estate Tax Regs., defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." See also United States v. Cartwright,411 U.S. 546 (1973). In a case involving similar real estate, we expressed our approval of the comparable sales method of valuation, although we found certain adjustments were appropriate. Estatge of Nail v. Commissioner,59 T.C. 187 (1972). As all experts in this case use the comparable sales method in their opinions of the property's fair market value, we find this to be a logical starting point. Petitioner's expert, Homer Etheredge (Etheredge), used four comparable sales in expressing his opinion of fair market values: Sale #
Date of Sale
Trace Acres
Price per Acre
1
12/7/84
80
$ 500
2
1/10/83
80
500
3
1/17/84
53
562
4
4/9/84
177
500
Respondent submitted reports from two expert witnesses, A. Duane Neill (Neill), who was the revenue agent who handled the case, and Vernon (Hap) Bratcher *485 (Bratcher) who, like Etheredge, is familiar with and has been appraising real estate in the Lamesa, Texas, area for many years. Bratcher used five comparables as follows: Sale #
Date of Sale
Tract Acres
Price per Acre
1
1/10/83
80
$ 500  2
3/3/83
160
825    3
1/10/83
40
500    4
4/19/83
160
512    5
10/3/83
160
[15] 525
Neill was more comprehensive in his survey of sales in the area, having surveyed 16 real estate transactions taking place between February 1983 and April 1985. Of these 16 sales, he felt only nine were geographically located close enough to the subject property to warrant inclusion as comparable sales. Of these nine, only the following five were considered truly comparable as they did not concern family sales, nor did they involve sales under threat or imminence of foreclosures: Sale #
Date of Sale
Tract Acres
Price per Acre
1
1/11/84
160
$ 700  2
1/24/84
53
[16] 562
3
4/24/84
160
725    4
2/12/85
160
650    5
6/27/85
80
575    Neill found two of these tracts to be comparable to the subject property *486 in its soil quality and topographical natural. The third transaction involved a tract which Neill thought to be inferior to the subject property, an evaluation with which we agree. Neill's two other comparable sales involved tracts which he thought were quite comparable in every respect except date of sale, since they involved transactions taking place 13 and 16 months after decedent's death. We agree with Neill on the basic valuation, and find that the undiscounted fair market value of this subject property is $ 700 per acre for the tracts which were community property and $ 600 per acre for the tract of separate property. The experts were agreed to a great extent on some of the factors we find material to determining the fair market value of the subject properties. While all of the comparable sales were of farms without irrigation capacity, [17] all three experts agreed that the pivot irrigation system placed by James Anderson upon the properties was not economically feasible and did not materially increase their value. They were also agreed that land values in the area peaked in 1980 or 1981 with a decrease in value over the subsequent years. Etheredge and Bratcher agreed that *487 wash areas on the property would reduce its value. However, neither of these experts attempted, or were even asked, to quantify the detriment to the property occasioned by these wash areas. We therefore have no basis for considering such a discount. None of the experts was aware of the nematode infestation on the subject properties, but upon becoming informed of that infestation, each expert agreed that a discount may be appropriate. The amount of the discount varied among the experts, Etheredge allowing a 20-percent discount and Bratcher allowing a 10- to 15-percent discount. Neill was of the opinion that a mild to moderate infestation may be merely part of the cost of doing business on such property and would allow no discount in the absence of proof of a severe infestation. We agree with Neill that a discount is inappropriate, although for different reasons. Petitioner called Edward L. Brown (Brown) as a witness. Brown had been in charge of the Agricultural Stabilization and Conservation Service office in Dawson County prior to his retirement in 1983. *488 Brown's testimony, which we found credible and informed, shows that nematode infestation is more common on irrigated land than on land that was dry farmed. Brown further testified that at least 90 percent of the land in Dawson County was dry farmed. As we have noted, all of the transactions considered comparable by the experts involved dry farms. Although Brown's testimony shows that nematodes do survive in dry land, it is clear that the nematode infestation on decedent's irrigated land was greater than that on the dry land which was the subject of the comparable sales. However, we do not agree with Etheredge and Bratcher that a 10-19 percent discount is warranted. Based upon Brown's testimony, we find that a nematode infestation could be brought under control in three to five growing seasons, although never eliminated, through the planting and dry farming of wheat and grain sorghum, even though such crops were not as productive as cotton, the area's main cash crop, and had a negative effect on Government subsidies. After 3 to 5 years, a discount for such infestation would be inappropriate as the infestation would be lessened to a degree approximately that of the comparable *489 sales. Unfortunately, neither Etheredge nor Bratcher took account of the fact that the infestation could be lessened, both apparently being of the opinion that the infestation was a permanent burden on the land. As this is not the case, and petitioner has presented no evidence concerning the impact on the subject property's fair market value or its decreased productivity for those few years, we have no basis upon which to apply a discount for the nematode infestation. It is, of course, possible as a practical matter that the full discount would be applied by a prospective buyer until the infestation was actually controlled, but without evidence on which to rely, any such conclusion by us would be pure speculation. Etheredge and Bratcher also agreed on at least 20-percent discount in light of the fact that decedent owned a one-half undivided interest in the community property. Neill's disallowance of a discount for this fact is not so much a matter of opinion of fair market value but rather of respondent's policy of not allowing discounts for such factors in cases in which the entire property is sought to be brought within the gross estate pursuant to section 2036. We have rejected *490 this unity of ownership theory, Estate of Andrews v. Commissioner,79 T.C. 938 (1982); Estate of Lee v. Commissioner,69 T.C. 860 (1978); as has the Fifth Circuit in an en banc opinion. Estate of Bright v. United States,658 F.2d 999 (5th Cir. 1981). [18] Petitioner's expert, Etheredge, was of the opinion that a 20-percent discount was appropriate, a figure at the low end of the 20- to 25-percent discount which would have been applied by respondent's other expert, Bratcher. These two experts being in approximate agreement, we find that a 20-percent discount for decedent's undivided interest is applicable to the community property tracts. We therefore find that the fair market value of those tracts is $ 560 per acre rather than $ 700 per acre. As we have already found, the fair market value of what was Mr. Anderson's separate property *491 is $ 600 per acre. Decisions will be entered for the petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect either during the Calendar quarter at issue or as of the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Under section 38(b) of the Texas Probate Code, decedent would receive one-third of all of Mr. Anderson's personal property and a life estate in one-third of Mr. Anderson's real property. 3. While inherited property is the separate property of the devise under Texas law, income from such property is community property, thus necessitating a conveyance by both James and his wife. 4. While the dead purported to convey a life estate in all Mr. Anderson's real property, decedent was already a life tenant in one-third of the 154-acre tract and in one-sixth (1/3 of 1/2) of the other tracts pursuant to Texas law. ↩
5. Section 37A↩ was added by Acts 1971, 62nd Leg., p. 2954, Ch. 979, sec. 1, effective August 30, 1971. 6. While Price v. United States,470 F. Supp. 136 (N.D. Tex. 1979), affd. per curiam 610 F.2d 383 (5th Cir. 1980), lends some support to respondent's position, it does not address the question before the court as clearly as the cases discussed infra,↩ and will not itself be discussed further. 7. We note our decision in Hardenbergh v. Commissioner,17 T.C. 166 (1951), affd. 198 F.2d 63 (8th Cir. 1952), cert. denied 344 U.S. 836 (1952), which involved an agreement by two of the decedent's heirs to renounce their intestate shares in favor of the sole remaining heir, so that decedent's wish that the financial worth of his survivors be equalized would be carried out. We found that such an agreement "effected a 'transfer' within the meaning of the Federal gift tax law." Hardenbergh v. Commissioner, supra at 171. However, that case is distinguishable since under local law, an heir could not renounce property passing by intestacy, a rule of law since abrogated by statutes such as section 37A, Tex. Probate Code Ann.↩ (Vernon 1980). 8. As the Supreme Court stated in Harris v. Commissioner,340 U.S. 106, 107↩ (1950), "the purpose of the gift tax is to prevent the tax-free depletion of the transferor's estate during his lifetime." 9. At least one Texas court has recognized that while a family settlement is binding upon the parties, it is at least a substitute for, and amounts to a transfer of property. See In re Estate of Morris,577 S.W. 2d 748, 755↩ (Tex. Civ. App. 1979). 10. By reason of our disposition of this case, it is unnecessary to determine whether, under Texas law, the agreement to refrain from probating the will was or would have been effective to cause the property to pass by intestate succession. ↩
11. For disclaimers of interests created by post-December 31, 1986, transfers, see section 2518. ↩
12. Neither was such a statement reflected in respondent's 30-day letter dated September 4, 1985. ↩
13. In this case, we held that where decedent transferred stock to his children who then transferred to decedent lifetime income rights subject to 10-year income rights in themselves, the stock was not required to be included in decedent's gross estate under section 2036. 14. Should an appellate court find that decedent's disclaimer was invalid, and that decedent made a transfer for gift tax purposes in either August 1973 or February 1974, a determination of the fair market value of the real estate constituting the gift would be necessary. Petitioner presented no evidence concerning the fair market value of the property at that time. As petitioner bears the burden of proof, Rule 142(a); Welch v. Helvering,290 U.S. 111↩ (1930), respondent's determination of value for this purpose would be sustained. 15. Not included in the price is $ 12.50 per acre given for an option to buy other real estate. ↩
16. This is the same transaction as Etheridge's sale #3; the record is unclear as to the correct date of the transaction.↩
17. Neill examined one transaction concerning an irrigated tract, but did not find it sufficiently comparable for his appraisal. ↩
18. See Minahan v. Commissioner,88 T.C. 492, 500 (1987), where we commented that respondent seeks to repudiate a well-established line of cases of long and reputable ancestry, going back as far as 1940. * * * In the instant cases, respondent persists in the face of Estate of Andrews↩ and its progenitors; in these cases, the persistence is unreasonable.