T.C. Memo. 1999-202

UNITED STATES TAX COURT

RICHARD AND MARGARET SHERMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11665-97.                    Filed June 18, 1999.

Richard Sherman, pro se.

Margaret Sherman, pro se.

<u>Jack H. Klinghoffer</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  Respondent determined a $70,120 deficiency in
petitioners' 1993 Federal income tax.  The sole issue for decision
is whether the $207,000 Richard Sherman (petitioner) received upon
termination of his employment with International Business Machines

Corporation (IBM) is excludable from petitioners' 1993 gross income pursuant to section 104(a)(2) as damages received on account of personal injury or sickness.

All section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioners resided in New Canaan, Connecticut, at the time they filed their petition.

Petitioner was born on April 23, 1938. He graduated from Yale Law School in 1964, and subsequently became a member of the New York and District of Columbia bars. Margaret Sherman, petitioner's wife, did not work outside the home.

Employment with IBM

Petitioner was employed by IBM between December 1, 1965, and May 28, 1993. At all relevant times, he was a staff attorney, assigned to the IBM corporate division.

The IBM corporate division determined that "permanent resource reductions" (permanent employee layoffs) were necessary. This determination was announced sometime in February 1993.

Mr. D.A. Evangelista was the general counsel of IBM in March 1993. He was informed that his organization had to reduce the number of employees (attorneys as well as administrative staff) from 135 to 120. Of the "resource reduction target" of 15, it was determined that 2 would come from Mr. L.D. Pearson's group, to which petitioner was assigned.

Petitioner was "identified as surplus" based on an "appraisal sequence banding" used to compare the performance of employees during the period of February 16, 1990, to February 15, 1993. The bandings were alphabetically designed: Band A, was composed of the highest rated employees, through band G, which was composed of the lowest rated employees. Of the three attorneys reporting to Mr. Pearson, one was in band A, another in band C, and the third, petitioner, was in band E.

For the period February 16, 1990, to February 15, 1993, petitioner had only two performance evaluations, one conducted in April 1990, and the other in June 1991. Both placed him in band E. Petitioner objected to both of these evaluations.

In July 1989, petitioner filed an "open door" request (internal grievance), questioning whether Mr. Pearson improperly failed to promote him. In February 1990, petitioner filed another "open door" request, claiming retribution due to his earlier "open door" request. In May 1992, petitioner filed an unfair labor

practice charge against IBM with the National Labor Relations Board (NLRB). The charge states:

> Since on or about May 4, 1992, the above-named employer [IBM], by its officers, agents and representatives, informed Richard Sherman that he was evaluated and ranked in the 10% lowest ranking category, thereby making him susceptible to a potential future layoff, because he engaged in concerted activities with other employees of said employer for the purpose of collective bargaining and other mutual aid and protection and in order to discourage employees from engaging in such activities.
>
> On or about May 4, 1992, the above-named employer [IBM], by its officers, agents and representatives, retaliated against Richard Sherman by ranking him in the 10% lowest category making him susceptible to a potential future layoff, because said employee gave testimony under the Act.

An NLRB representative informed petitioner that the NLRB was not going to file a charge against IBM. The NLRB representative also told petitioner that IBM's outside counsel, Covington & Burling, stated that petitioner was a "valued employee and that [petitioner's] continued employment is not threatened." By letter dated August 27, 1992, petitioner withdrew his charges against IBM.

On March 16, 1993, petitioner was notified that he had been designated as a "surplus employee", and as a result, his employment with IBM would likely terminate on May 28, 1993. On March 17, 1993, petitioner wrote a memorandum to Mr. Evangelista requesting that his surplus designation be withdrawn. On March 22, 1993, petitioner wrote a memorandum to four of IBM's management executives, including IBM's chief executive officer and chief

personnel officer, requesting that his surplus designation be withdrawn. In a footnote to this memorandum, petitioner referred to a dispute between IBM and Mr. Murray, an attorney in IBM's legal department who had been fired. The footnote stated:

> IBM Legal management chose not to negotiate with Mr. Murray, and instead fired him. IBM is now in extensive litigation with Mr. Murray. By current estimate, IBM has already spent more than $800,000 (internal and external costs) on litigation involving Mr. Murray.

On March 24, 1993, petitioner wrote a second memorandum to the same four IBM management executives, requesting an "open door" with regard to his surplus employee designation. In this request, petitioner stated:

> There is one aspect of the Open Door procedure which is troublesome and which I ask you to address. Legal management has the right to review Open Door investigation reports and conclusions prior to their submission to the chairman's office for decision. I understand that Legal management has used that power in the past to modify some reports and conclusions. In the case of this Open Door, that would create a conflict of interest. Therefore, I ask that the Legal Department not be permitted to review the investigator's findings prior to submission to executive and oversight management.

Sometime in the latter part of March 1993, petitioner collapsed while at work, losing consciousness for a brief period of time. Petitioner's collapse resulted in injuries (including hand tremors, weight loss, and severe headaches). All medical expenses incurred by petitioner as a result of his injuries were submitted to IBM and paid under IBM's medical plan.

On May 6, 1993, petitioner was advised that his "open door" request had been denied, and despite his objections, his employment would be terminated on May 28, 1993. IBM offered petitioner an opportunity to participate in its Corporate Transition Program (CTP), whereby petitioner would be entitled to receive the equivalent of 1-year's salary--$107,000--on the condition he execute an appropriate release.

At this time, petitioner learned that IBM was hiring new, younger attorneys (recent graduates or individuals about to graduate from law school). Petitioner consulted an attorney who advised him that he had a viable cause of action against IBM for age discrimination. Accordingly, petitioner refused to participate in the CTP.

Negotiations between IBM representatives and petitioner ensued. During the course of these negotiations, petitioner threatened to obtain an injunction against IBM to stop its layoff program (at that time, IBM was laying off 30,000-40,000 employees). On May 13, 1993, petitioner and IBM entered an agreement entitled "Settlement Agreement and Release" (settlement agreement). The settlement agreement states in pertinent part:

> WHEREAS, Mr. Sherman has made certain allegations about the propriety and lawfulness of his having been designated as a "surplus employee" resulting in claims of physical and mental injury and stress;

WHEREAS, IBM and Mr. Sherman understand and recognize the inherent expense and risk involved in litigation;

WHEREAS, IBM and Mr. Sherman wish to resolve finally, completely and forever all disputes including but not limited to allegations of physical and mental injury, unfair labor practices, discrimination, retaliation, or any other allegations of unlawful conduct that Mr. Sherman has made or could have made, whether known or unknown, concerning anything that has occurred during his employment with IBM;

*     *     *     *     *     *     *

NOW, THEREFORE, it is hereby agreed as follows:

1.    IBM agrees to pay Mr. Sherman the sum of $103,500 fifteen days after he signs this Agreement and has his signature notarized and $103,500 on December 31, 1993. For withholding purposes, IBM is required to withhold certain sums pursuant to the tax code and regulations; but it will do so without prejudice to Mr. Sherman taking the position that some or all of these sums are excludable from his taxable income.

*     *     *     *     *     *     *

4.    Mr. Sherman will cease being an IBM employee on May 28, 1993.

*     *     *     *     *     *     *

6.    Mr. Sherman agrees to release IBM from all claims, demands, actions, liabilities or charges (hereinafter "claims") that he may have against IBM of whatever kind or nature for or on account of anything that has occurred, including but not limited to, any claims for physical and mental injury, and any claims which are related to his employment with IBM, such as claims of retaliation, the termination

of that employment, or eligibility for other severance payments or his eligibility or participation in the Retirement Bridge Leave of Absence or CTP.

\* \* \* \* \* \* \*

       c.     This Agreement releases, but is not limited to, claims for physical and mental injury, claims arising under the Age Discrimination in Employment Act of 1967, as amended, the National Labor Relations Act of 1935, as amended ("NLRA"), Title VII of the Civil Rights Act of 1964, as amended, the Employee Retirement Income Security Act of 1974, as amended or any other federal, state, or local law pertaining to employment, including but not limited to, discrimination or retaliation in employment based on sex, race, national origin, religion, disability, veteran status, age and the filing of an unfair labor practice charge with or supplying an affidavit to the National Labor Relations Board. This Agreement also releases any and all claims based on theories of contract or tort, whether grounded in common law or otherwise.

       d.     This Agreement releases all claims including those that Mr. Sherman knows about and those that he may not know about which have accrued at the time he executed this Agreement.

\* \* \* \* \* \* \*

18.     Nothing in this Agreement shall be construed as or constitute an admission with respect to the validity of any claims or allegations which Mr. Sherman has made or could have made concerning his employment with IBM or with respect to any other matter.

The settlement agreement did not apportion the $207,000 payment among the various potential claims.

In 1993, IBM paid petitioner the $207,000, in two payments of $103,500. IBM included the $207,000 in petitioner's Form W-2, and applied withholding tax to the entire amount.

1993 Federal Income Tax Return

On their 1993 Federal income tax return, petitioners excluded the $207,000 payment from their income. Appended to their return was a document entitled "Exclusion of Settlement of Personal Injury Claim (Age Discrimination) from Gross Income". In relevant part, the document stated:

> In exchange for a payment of $207,000 I agreed in paragraph number 6(c) to release all claims for age discrimination, including those available under Title VII of the Civil Rights Act, as amended. I was 55 years old at the time IBM was hiring new lawyers (either recent graduates or persons about to graduate from law school).
>
> *       *       *       *       *       *       *
>
> Therefore I have excluded the $207,000 settlement for age discrimination from gross income.

Notice of Deficiency

In the notice of deficiency, respondent determined that the entire $207,000 settlement payment petitioner received from IBM is includable in petitioners' 1993 gross income.

OPINION

The sole issue for decision is whether the $207,000 petitioner received as a result of the termination of his

employment with IBM is excludable from petitioners' 1993 gross income pursuant to section 104(a)(2).

Pursuant to section 104(a)(2), gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." The regulations provide that "The term 'damages received (whether by suit or agreement)' means an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Sec. 1.104-1(c), Income Tax Regs. Thus, in order to exclude damages from gross income pursuant to section 104(a)(2), the taxpayer must prove: (1) The underlying cause of action is based upon tort or tort type rights, and (2) the damages were received on account of personal injuries or sickness. See Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995). The claim must be bona fide. See Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994).

Where amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement controls whether such amounts are excludable from gross income under section 104(a)(2). See United States v. Burke, 504 U.S. 229, 237 (1992). The crucial question is "in lieu of what was the settlement amount paid"? Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997). Determining the nature

of the claim is a factual inquiry.  See <u>Robinson v. Commissioner</u>, 102 T.C. 116, 127 (1994), affd. in part, revd. in part on another ground and remanded 70 F.3d 34 (5th Cir. 1995).

In the statement appended to their 1993 return, petitioners state that the $207,000 payment from IBM was in exchange for petitioner's "release [of] all claims for age discrimination, including those available pursuant to title VII of the Civil Rights Act."  Subsequent to the filing of petitioner's 1993 return, the Supreme Court in <u>Commissioner v. Schleier</u>, <u>supra</u>, in resolving a conflict among the circuits, held that back pay and liquidated damages recovered for age discrimination under the Age Discrimination in Employment Act of 1967, Pub. L. 90-202, 81 Stat. 602, currently codified at 29 U.S.C. secs. 621-634 (1994), are not excludable from gross income under section 104(a)(2) because (1) the statute does not sound in tort, and (2) no part of the recovery is received on account of personal injuries or sickness.  (We note that several years prior to rendering its opinion in <u>Schleier</u>, the Supreme Court in <u>United States v. Burke</u>, <u>supra</u>, held that back pay awarded in settlement of title VII claims is not excludable from gross income under section 104(a)(2).)

In their petition that was filed after the Supreme Court rendered its opinion in <u>Schleier</u>, petitioners assert that the $207,000 payment was solely in settlement of petitioner's claim for physical and mental injury.  They claim that petitioner had a cause

of action against IBM for age discrimination which could be brought either in contract or tort and that petitioner intended to institute such a lawsuit in tort.

The language of paragraph 6 of the settlement agreement is clear. In exchange for $207,000, Mr. Sherman agreed to release IBM from all claims and actions, whether based in contract or in tort. Specifically, petitioner agreed to release IBM from all claims arising from "any * * * law pertaining to employment, including but not limited to, discrimination or retaliation in employment based on sex, race, national origin, religion, disability, veteran status, age and the filing of an unfair labor practice charge" as well as any claims based "on theories of contract or tort". (We note that the mere listing of a specific cause of action in the settlement agreement does not prove that petitioner actually possessed such a claim against IBM. In fact, the settlement agreement states: "Nothing in this agreement shall be construed as or constitute an admission with respect to the validity of any claims or allegations which Mr. Sherman has made or could have made concerning his employment with IBM or with respect to any other matter.") Moreover, there is no allocation of the $207,000 payment to or among any claim or claims petitioner may have had against IBM.

The settlement agreement neither mentions any specific injury sustained by petitioner nor states that the amount petitioner is to

receive thereunder is for a personal injury claim petitioner has against IBM. The references to physical and mental injury in the settlement agreement were inserted pursuant to petitioner's request. Indeed, the cover letter from IBM's corporate counsel to petitioner (with which was enclosed a draft of the settlement agreement) states:

> The draft attempts to accommodate your request that we make it clear that you have asserted claims for personal injuries and that the lump sum payments is in settlement of those as well as all other claims.

According to petitioner, he collapsed and suffered injuries (hand tremors, weight loss, and severe headaches) due to the stress he experienced as a consequence of IBM's termination of his employment. At trial, we observed that petitioner experienced tremors in his hands. Although at times, wrongful employment termination possibly may result in personal injury, if the amount of lost wages or other compensation received in such cases is not linked to that personal injury, such an award will not qualify for the exclusion from gross income provided in section 104(a)(2). See Commissioner v. Schleier, supra at 330. Such is the case herein.

Where a settlement agreement lacks express language stating what the settlement amount was paid to settle, then the most important factor is the intent of the payor. See Knuckles v. Commissioner, 349 F.2d 610, 612-613 (10th Cir. 1965), affg. T.C. Memo. 1964-33. The best indicator of IBM's intent is the language

of the settlement agreement. The agreement's broad language indicates that IBM considered the $207,000 payment as a quid pro quo for petitioner's release of all potential claims against IBM, including, but not limited to, tort claims. IBM did not make an identifiable portion of the payment in settlement of petitioner's personal injury claim. The payment was for severance pay as well as for petitioner's release of potential tort and nontort claims against IBM.

It is apparent to us that IBM viewed petitioner as litigious. Petitioner formally disputed management's decision to end his employment. He threatened to obtain an injunction to stop IBM's downsizing program. He had previously filed an unfair labor practice charge against IBM with the NRLB. And he had filed several formal complaints against his supervisors. It was against this background that IBM negotiated a termination settlement with petitioner.

The final settlement amount--$207,000, represented an amount equal to petitioner's 1-year salary ($107,000), plus $100,000. Petitioner testified that he wanted a settlement equal to three times his annual salary (or $321,000).

We conclude that IBM did not intend for any portion of the $207,000 to be specifically carved out as a settlement of a tort or tort type claim on account of a personal injury or sickness.

The United States Court of Appeals for the Second Circuit, where an appeal in this case would lie, held in <u>Taggi v. United States</u>, 35 F.3d at 96, that failure to show the amount of a payment allocable to claims of tort or tort type damages for personal injuries results in the entire amount being presumed not to be excludable. See <u>Pipitone v. United States</u>, ___ F.3d ___ (7th Cir., June 14, 1999); see also <u>Getty v. Commissioner</u>, 91 T.C. 160, 175-176 (1988), affd. as to this issue and revd. on other issues 913 F.2d 1486 (9th Cir. 1990); <u>Morabito v. Commissioner</u>, T.C. Memo. 1997-315. As in <u>Taggi</u>, the release in this case is all-encompassing and includes different potential tort and nontort claims. As stated, no part of the payment was allocated to any one cause of action. And, petitioner has not proven which portion, if any, of the $207,000 was received in settlement of tort or tort type claims of personal injury. Thus, assuming petitioner sustained a personal injury as a consequence of IBM's termination of his employment, the record reflects no basis for an allocation, and, we are not in a position to apportion the payment among the various possible tort and nontort claims enumerated in the settlement agreement. See, e.g., <u>Adams v. Commissioner</u>, T.C. Memo. 1997-357; <u>Morabito v. Commissioner</u>, <u>supra</u>.

We have considered all of petitioners' other arguments and, to the extent not discussed above, find them to be without merit.

In sum, we hold that the $207,000 settlement payment petitioner received from IBM is not excludable from petitioners' 1993 gross income under section 104(a)(2).

To reflect the foregoing,

Decision will be entered

for respondent.